(No. 105092.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JERMAINE DAVIS, Appellant.

*Opinion filed May 21, 2009.*

Michael J. Pelletier and Patricia Unsinn, Deputy Defenders, and Douglas R. Hoff, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Annette Collins, Veronica Calderon Malavia, Judy L. Deangelis and Amy Watroba Kern, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Defendant, Jermaine Davis, was charged with aggravated battery, armed robbery and first degree murder. The first degree murder charge was brought under three different theories—intentional murder, knowing murder (also called strong probability murder), and felony murder. See 720 ILCS 5/9—1(a) (West 2004). The intentional and strong probability murder counts each alleged that defendant and his two codefendants—Maurice Thomas and Edward Durant—beat and killed the victim "with their fists, feet and a board." The felony-murder count alleged that defendant and the others beat and killed the victim "with their fists, feet and a board during the commission of a forcible felony, to wit: aggravated battery." The aggravated battery count likewise alleged that defendant and the others beat the victim "with their fists, feet and a board." A jury in the circuit court of Cook County returned a general verdict of guilty against defendant on the first degree murder charge, as well as a guilty verdict on the offense of aggravated battery. Defendant was sentenced to serve 25 years in prison.

Defendant appealed, arguing, *inter alia*, that (1) the cause must be remanded for a hearing under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), because the trial court improperly collapsed the three-step *Batson* process and allowed the State's peremptory challenge of an African-American venire member without engaging in the third stage of the analysis, and (2) because the conduct forming the basis of his aggravated battery was inherent in the murder, the trial court erred in instructing the jury it could convict him of felony murder predicated on aggravated battery. The appellate court rejected those claims and affirmed defendant's convictions and sentence. No. 1—05—1251 (unpublished order under Supreme Court Rule 23).

We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315.

On our initial consideration of this case, we agreed with defendant that the trial court impermissibly collapsed the three-step *Batson* process. Accordingly, we remanded the cause for a full *Batson* hearing, beginning with the *prima facie* stage and with the understanding that it was possible that the *Batson* inquiry could end there if defendant failed to establish a *prima facie* case of racial discrimination. See *People v. Davis*, 231 Ill. 2d 349, 369 (2008). We also urged the trial court to make a proper record with findings of fact and conclusions of law, while at the same time we recognized that some determinations might be difficult to make now that several years had elapsed since the *voir dire* proceedings. See *Davis*, 231 Ill. 2d at 364, 366, 368-69.

On January 16, 2009, the trial court conducted the hearing required by our remand and then entered a written order, specifying its findings of fact and conclusions of law. The trial court ultimately concluded that defendant failed to establish a *prima facie* case of racial discrimination. The case now comes back to us for our resolution of the *Batson* issue in light of the proceedings conducted below and the trial court's findings. We also now address the remaining pending issue related to the felony-murder instruction.

## BACKGROUND

The relevant facts prior to remand were fully set forth in our previous opinion. We will reiterate the necessary facts so as to provide a proper framework for our disposition, including facts relative to the issue that resulted in remand.

Defendant's trial began on February 20, 2004, with *voir dire*. Defense counsel questioned venireman Robert Hicks in the course of selecting the jury. That questioning revealed that Hicks was a retired janitor, who had

lived in Chicago since 1970. When asked if he could be a fair juror if selected, Hicks said, "I think so." Defense counsel followed this up by asking if Hicks was "comfortable [that he could] be fair." Hicks responded, "I am comfortable." The prosecutor did not ask any questions of Hicks.

*Voir dire* proceeded, and after one additional prospective juror was questioned, the prosecutor announced that he would exercise a peremptory challenge to Hicks. At that point, defense counsel requested a discussion with the court off the record. Upon returning to the record, the trial court decided to conduct its own inquiry into whether the State had committed a *Batson* violation in its challenge to Hicks.

During its inquiry, however, the trial court did not follow the methodical three-step approach delineated by *Batson* and required by our case law as follows: (1) the defendant must make out a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecutor to provide a race-neutral reason for excluding the juror in question; and (3) the trial court then weighs the evidence and determines if the defendant proved purposeful discrimination. *People v. Easley*, 192 Ill. 2d 307, 323-24 (2000); *People v. Munson*, 171 Ill. 2d 158, 174 (1996). The trial court did not consider the first step and made no finding that a *prima facie* case had been established. Instead, the trial court jumped to the second step, found that the State's proffered rationale for excluding Hicks was race neutral, and then ended its analysis there.

*Voir dire* was eventually completed and the case proceeded to the evidentiary portion of the trial, where it was established that a group of men beat Demetrius Thomas unconscious on October 10, 1999, near a Chicago housing project. A Chicago Housing Authority police officer responded to a call about the incident and found

Demetrius Thomas lying in a garbage dumpster. The victim was taken to a hospital and remained in a coma for two months before he died of an infection that resulted from the brain injuries he suffered in the beating.

Quincy Campbell was a key witness that testified on behalf of the State. He had a criminal record and was a suspect in the case until he gave a statement to police. At trial, he stated that he witnessed a group of men beat the victim. Campbell had difficulty at trial, however, with names and events, claiming that he did not remember any of the names of the people involved in the beating. But he did acknowledge at trial that he had given a written statement to police on January 3, 2000, about the incident. According to Campbell's written statement, he knew from the neighborhood four of the five men who beat the victim. They were Maurice Thomas, Pee Wee (a.k.a. Edward Durant), Hip Hop, and Kevin. Campbell identified defendant as Hip Hop at trial.

Campbell's written statement further indicated that during the encounter, Pee Wee struck the victim with a stick three times. Campbell described the stick used to beat the victim as a piece of cut lumber. At one point, the victim got on his feet and ran. But Thomas, Pee Wee, Kevin and defendant chased him around a building, where the others began beating him again. When the victim fell to the ground, defendant began striking him with his feet. At one point, Pee Wee went through the victim's pockets. While Campbell was watching the beating, Thomas asked Campbell to act as a lookout for police, but Campbell refused. When the beating ended, defendant picked up the victim by the collar and pants and tossed him into a garbage dumpster. Campbell denied participating in the beating and denied that the victim's sister, Samara Sadler, was present.

Other evidence presented revealed that police conducted a lineup on January 22, 2000, in which Campbell

identified defendant. Later that day, police confronted defendant with the fact of that identification. Defendant then gave a written statement to an assistant State's Attorney in which defendant admitted his involvement in the incident. According to that statement, defendant was "hanging out" in the area when he saw Maurice Thomas bring the victim outside from the building. The victim broke free of Maurice's grasp, ran around the back of the building and entered a hallway on the first floor. Maurice ran after him, and Maurice and Pee Wee proceeded to beat the victim. Defendant "kept watch" from about two feet away to make sure no one saw what was going on or tried to interfere. After Maurice and Pee Wee finished the beating, the victim was lying face down and unconscious. Defendant then grabbed him by the back of his pants and shirt and threw him into a dumpster.

Samara Sadler, sister of the victim, testified for the defense. She observed the victim come out of the building with Campbell and Maurice Thomas. Campbell and Maurice then began hitting the victim. She knew both Campbell and Maurice from the neighborhood. The group ran around the building and Sadler followed. When she got there, she observed the victim lying on the ground and unconscious. Two or three men were around the victim, and she did not know if one of them was defendant. She knew defendant from the neighborhood, but testified that she did not see defendant strike the victim at any time.

During its closing argument, the State argued that it was not necessary that it prove defendant intended to kill the victim, but only that defendant or one for whom he was accountable combined to do an unlawful act, such as commit an aggravated battery and that the victim was killed by one of the parties committing that act. Because defendant was a part of the aggravated battery, he was legally responsible for the victim's death. The State noted

that there were three options for first degree murder, but it only had to prove one. The State further argued that Durant (Pee Wee) knew there was a strong probability of death when he hit the victim and that defendant was accountable. However, even if the jury did not believe this, defendant was still guilty of murder if he or someone he was accountable for committed aggravated battery.

The jury was instructed on all three theories of first degree murder as follows:

> "A person commits the offense of first degree murder when he kills an individual if in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual, or he knows that such acts will cause death to that individual, or he knows that such acts create a strong probability of death or great bodily harm to that individual, or he is committing the offense of aggravated battery." See Illinois Pattern Jury Instructions, Criminal, No. 7.01 (4th ed. 2000).

The jury was also instructed that defendant could be held legally accountable for the murder as follows:

> "To sustain a charge of first degree murder, the State must prove the following propositions:
>
> First: That the defendant or one for whose conduct he is legally responsible performed the acts which caused the death of Demetrius Thomas, and second: That when defendant or one for whose conduct he is legally responsible did so, he intended to kill or do great bodily harm to Demetrius Thomas, or he knew that his acts created a strong probability of death or great bodily harm to Demetrius Thomas, or he was committing the offense of aggravated battery." See Illinois Pattern Jury Instructions, Criminal, No. 7.02 & Committee Note (4th ed. 2000).

Defendant objected to these instructions at trial on the basis that they contained "accountability language." Defendant, however, did not object at trial to the instructions on the basis that they improperly informed the jury that it could convict him of felony murder based on aggravated battery. Defendant also did not object to the submission of a general verdict form. The jury returned

a general verdict finding defendant guilty of first degree murder, and he was ultimately sentenced to 25 years in prison.

Defendant filed a posttrial motion, claiming that the trial court erred in ruling on the *Batson* issue that arose after the State's use of a peremptory challenge to an African-American venireman. Defendant additionally argued that the court erred in giving IPI Criminal 4th Nos. 7.01 and 7.02 because those instructions informed the jury that it could convict defendant of felony murder based on aggravated battery. Also, defendant argued that he was denied the effective assistance of trial counsel when counsel failed to request a special verdict form. The trial court denied the motion.

Defendant appealed, contending first that the cause should be remanded for a new *Batson* hearing because the trial court improperly collapsed the three-step process. Defendant's second contention was that the trial court erred in instructing the jury that it could find him guilty of felony murder predicated on aggravated battery. Defendant did not argue, however, that his counsel was ineffective in failing to request a special verdict form.

The appellate court first set out the three-step process for a *Batson* claim as follows: (1) defendant must make a *prima facie* showing that the prosecutor exercised a peremptory strike on the basis of race; (2) the burden then shifts to the prosecutor to provide a race-neutral reason for excluding the juror in question; and (3) the trial court then weighs the evidence and determines if the defendant proved purposeful discrimination. See No. 1—05—1251 (unpublished order under Supreme Court Rule 23). The appellate court then found that the State's proffered reason was valid and rejected defendant's claim that the cause should be remanded for a *Batson* hearing. In so doing, it affirmed the trial court's finding that the prosecutor's stated reason for excluding Hicks was race

neutral. The appellate court did not address whether the trial court failed to consider the third stage of *Batson* or whether it erred in asking for reasons for the State's challenge in the absence of a specific finding that a *prima facie* case existed. Instead, the appellate court itself looked at jurors who gave answers similar to venireman Hicks' answers about whether they could be fair, and it then determined from its review of the record that each of these jurors possessed additional characteristics that might have prompted the State to find them acceptable; therefore, it concluded that the State's articulated reasons were not pretextual. See No. 1—05—1251 (unpublished order under Supreme Court Rule 23).

The appellate court next considered defendant's claim that the trial court committed reversible error in instructing the jury on felony murder predicated on aggravated battery where the predicate felony is inherent in the act of murder itself. See *People v. Morgan*, 197 Ill. 2d 404, 447 (2001). The appellate court found that even assuming that the trial court erred in so instructing the jury, any error was harmless. No. 1—05—1251 (unpublished order under Supreme Court Rule 23), citing *People v. Ruiz*, 342 Ill. App. 3d 750, 756 (2003). The court noted that Illinois law is clear that " ' "where an indictment contains several counts arising out of a single transaction, and a general verdict is returned[,] the effect is that the defendant is guilty as charged in each count." ' " No. 1—05—1251 (unpublished order under Supreme Court Rule 23), quoting *Morgan*, 197 Ill. 2d at 448, quoting *People v. Thompkins*, 121 Ill. 2d 401, 455 (1988). Thus, if defendant is charged with intentional murder, strong probability murder and felony murder, and the jury returns a general verdict finding defendant guilty of murder, it raises a presumption that the jury found that the defendant committed the most serious crime charged, which is intentional murder. No. 1—05—1251 (unpub-

lished order under Supreme Court Rule 23), citing *Morgan*, 197 Ill. 2d at 448. Any error in instructing the jury on felony murder was therefore harmless. No. 1—05—1251 (unpublished order under Supreme Court Rule 23).

## ANALYSIS

### I. The *Batson* Issue

During the course of our initial review of this case, defendant argued that we should remand the cause for a *Batson* hearing because the trial court improperly collapsed the methodical three-step *Batson* approach. Defendant claimed that the trial court omitted the first step altogether and went directly to the second step of asking the State to provide its reason for excusing Hicks. According to defendant, the trial court then found the reason race neutral, but stopped there without considering the third step, at which it was required to evaluate the prosecutor's explanation in light of all the circumstances of the case and determine if defendant had proven purposeful discrimination. Defendant contended that the prosecutor's stated reason for striking Hicks was pretextual, as it applied equally to jurors who were not struck. Specifically, defendant pointed to answers given by jurors Roy Hunninghaus, Kimberly Katulka and Peter Pick and claimed that these jurors had equivocated in the same manner as Hicks when asked whether they could be fair.

We noted in our initial opinion that when a trial court acts *sua sponte* to conduct a *Batson* hearing, as it did here, it " 'must make an adequate record consisting of all relevant facts, factual findings, and articulated bases' for its finding of a *prima facie* case." *People v. Rivera*, 227 Ill. 2d 1, 5 (2007), quoting *People v. Rivera*, 221 Ill. 2d 481, 515 (2006). Here, the trial court never even explained whether it had found a *prima facie* case of discrimination that would warrant proceeding to the

second stage of a *Batson* inquiry. We further noted that our review was hampered by the inadequacy of the record made at the initial hearing that was held below and that the cause therefore had to be remanded for a *Batson* hearing that could potentially end at stage one, depending on whether defendant was able to establish a *prima facie* case. *Davis*, 231 Ill. 2d at 369. With respect to the first stage of the inquiry, we noted that a court must consider " 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike to see if they give rise to a discriminatory purpose." *Davis*, 231 Ill. 2d at 360, quoting *Batson*, 476 U.S. at 93-94, 96-97, 90 L. Ed. 2d at 85-86, 88, 106 S. Ct. at 1721, 1723. We further noted seven factors to consider when determining whether a defendant has made a *prima facie* showing that a peremptory challenge was based on race:

"(1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Davis*, 231 Ill. 2d at 362, citing *Rivera*, 221 Ill. 2d at 501.

Additionally, we noted that an important tool in assessing the existence of a *prima facie* case is " 'comparative juror analysis,' which examines 'a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group.' " *Davis*, 231 Ill. 2d at 361, quoting *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006); see also *Mitleider v. Hall*, 391 F.3d 1039, 1049 n.9 (9th Cir. 2004)

(conducting comparative-juror analysis to discern whether differing life experiences justified the use of a peremptory strike against an African-American venire member in a case where a *prima facie* showing had been made). But we cautioned that comparative-juror analysis, standing alone, would not necessarily be sufficient to prove purposeful discrimination. *Davis*, 231 Ill. 2d at 362, see also *People v. Lenix*, 44 Cal. 4th 602, 626, 187 P.3d 946, 963, 80 Cal. Rptr. 3d 98, 118 (2008). Rather, comparative-juror analysis is simply an *additional* form of evidence to be considered and is just one factor in the totality of the circumstances that the court should take into consideration in considering the existence of a *prima facie* case. *Davis*, 231 Ill. 2d at 362; *People v. Lenix*, 44 Cal. 4th at 626, 187 P.3d at 963, 80 Cal. Rptr. 3d at 118.

The trial court began the January 16, 2009, proceeding on remand by first hearing from defense counsel. Counsel presented an official *Batson* challenge to the peremptory strike of venireman Hicks. The crux of the defense argument was that Hicks gave a similar answer to three white jurors—*i.e.*, Hunninghaus, Katulka and Pick—on the question of whether he could be a fair juror. After hearing defense counsel's argument, the court asked a number of questions of defense counsel relative to the seven *Rivera* factors. At the conclusion of the hearing, the trial court made a preliminary finding that the defense had not established a *prima facie* case. This finding was to be followed by a written order.

In its written order entered on January 23, 2009, the trial court duly noted the principles mentioned above that govern the *prima facie* stage of a *Batson* hearing. The court then applied the law to its factual findings. It began with the seven factors noted above.

First, the court found that the two prosecutors that exercised the peremptory challenge against Hicks are Caucasian and Hicks is African-American. Second, the

court found that there was no evidence of a pattern of strikes used against African-Americans. The only other African-American excused by a peremptory challenge was Andre Honorable.[1] Third, the court found that there was no evidence of a disproportionate number of peremptory strikes used against African-Americans. Fourth, the court noted that the record does not show the representation of African-Americans in the venire compared to the jury, and defense counsel at the hearing could offer nothing by way of comment on this factor. Fifth, the court considered the factor involving any question or comments by the prosecutor during the examination of the prospective juror who was struck and noted that the record showed that the State did not question Hicks. Rather, defense counsel questioned Hicks, and it was because of Hicks' response to the question of whether he could be fair that the State chose to strike him.

The court next considered the sixth factor of whether the excluded African-American members were a heterogeneous group sharing race as their only common characteristic. The court noted that during his *voir dire* examination, Honorable informed the court that he was employed as a truck driver. The court also noted that Honorable further stated that one of his family members or friends was a victim of a crime, but Honorable could not explain the situation. Honorable was also previously a party to a lawsuit that involved his employer. He further indicated that he liked to bowl and watch television. During additional questioning, he indicated that his wife was a

---

[1]The State initially moved to excuse Honorable for cause because he hesitated before stating that he could not remember if he or a family member had ever been a victim of a crime, even though he marked "yes" to that question on his juror questionnaire. The trial court denied the challenge for cause. The State then used a peremptory challenge to excuse Honorable. Defendant did not object to that strike, and he makes no *Batson* argument with respect to Honorable before this court.

cook, he had three adult children, and he read the Chicago Sun-Times. Hicks, on the other hand, informed the court that he was retired, but that he had previously worked as a janitor and a machine operator. Hicks had never married. He liked to fish, watch comedies and he obtained his news from channel 9. He had no close friends or family that were either police officers or prosecutors.

With respect to the seventh factor, the court determined that the defendant, the victim and all eyewitnesses to the case were African-American. The court also noted that there were white police officers and a white assistant State's Attorney who testified at trial.

Finally, the trial court engaged in a comparative-juror analysis of Hicks with jurors Hunninghaus, Katulka and Pick. The court noted that defense counsel identified these three as venire members that were ultimately selected for the jury and who provided answers similar to Hicks' answers when asked about their ability to be fair jurors. The court found, however, that there were significant differences between Hicks and the three selected jurors in question.

The trial court specifically noted that Hunninghaus' wife practiced personal injury law and that Hunninghaus had previously sat on a jury that reached a verdict. Also, Hunninghaus had been a victim of a residential burglary, where the burglar was apprehended, and Hunninghaus held no ill will against the police or the State's Attorney's office as a result. The court found that these were important characteristics and experiences applicable to Hunninghaus, but not to Hicks, from which the prosecutors could have concluded that Hunninghaus was a more favorable juror than Hicks despite his answer to the *voir dire* question at issue.

The court made a similar finding with respect to Katulka, noting that she had previously served on a jury

that had reached a verdict. She also watched the television show Law and Order. These were significant favorable characteristics that defendant did not share with Katulka. Additionally, the State may have considered her more favorable because both the question asked of her and the response she gave differed from the question and answer relative to Hicks. Katulka responded "I believe I can" when asked by the prosecutor if she could be fair to "both sides of the case." This must be considered in combination with the fact that just before her response noted above, Katulka had answered "yes," without any hesitation or qualification, to the prosecutor's question of whether she could sign a guilty verdict if the State met its burden to prove defendant guilty beyond a reasonable doubt.

Similarly, the court found that there was a key difference between Pick and Hicks. Even though Pick and Hicks provided the same response, the question presented to Pick was different from the question presented to Hicks. The record shows that the question posed to Hicks was whether he could be fair, but the question to Pick was whether he could be fair to *defendant*. The court found that the generality of the question posed to Hicks compared to the specificity of the question asked of Pick justified a different interpretation of the two venire members' similar response of "I think so."

In view of the above-noted factual findings, the trial court found that the three venire members identified by defendant for comparison with Hicks possessed specific characteristics that differed from Hicks from which it could be concluded that those jurors would be more favorable to the State than Hicks. According to the trial court, the State's decision not to use a peremptory challenge on those venire persons was therefore justified.

The trial court in its written order concluded that defendant failed to establish a *prima facie* case of racial

discrimination in connection with the peremptory strike of Hicks, stating as follows:

> "Considering the relevant factors when determining whether a *prima facie* showing has been made that a *Batson* violation occurred and after conducting comparative juror analysis, this Court finds that the defense has failed to present a *prima facie* case that a violation occurred. This finding is based on the record, assertion of the attorneys, and the report of proceedings.
>
> Moreover, this Court notes that all of the attorneys involved in this matter have appeared before this Court on numerous occasions. Based on this long standing interaction, this Court is of the opinion that State's Attorneys [Greg] Ahern and [Joe] Keating, along with Public Defenders Brendan Max and Preston Jones, an African American, are extremely professional and credible attorneys with the highest ethical standards."

We note that generally a trial court's ultimate conclusion on a *Batson* claim will not be overturned unless it is clearly erroneous; this deferential standard is appropriate because of the trial court's pivotal role in the evaluation process. *Davis*, 231 Ill. 2d at 364, citing *Snyder v. Louisiana*, 552 U.S. 472, 477, 170 L. Ed. 2d 175, 181, 128 S. Ct. 1203, 1207-08 (2008); see also *Munson*, 171 Ill. 2d at 175 (court's findings with respect to a *Batson* inquiry are entitled to great deference, and this includes the ultimate determination on discriminatory intent, which is subject to the "clearly erroneous" standard of review).[2]

---

[2]We are mindful that *Rivera*, 227 Ill. 2d at 11-12, applied a *de novo* standard of review to the ultimate conclusion in a *Batson* case. But it did so where the trial court affirmatively found that a *prima facie* case existed even though no party had even raised a *Batson* objection at any point. The standard of review enunciated in *Rivera* is not applicable here, however, because the trial court did not act to find that a *prima facie* case existed, and defendant on remand specifically raised a formal *Batson* objection and was fully allowed to make all arguments in support of his objection. Thus, the usual "clearly erroneous" standard of review is applicable.

Moreover, the party asserting a *Batson* claim has the burden of proving a *prima facie* case and preserving the record, and any ambiguities in the record will be construed against that party. *Davis*, 231 Ill. 2d at 365.

After carefully reviewing the record pertaining to the original *voir dire* proceeding and the hearing on remand, we conclude that the trial court correctly found that defendant failed to establish a *prima facie* case for a *Batson* violation. The court correctly concluded that the seven *Rivera* factors, taken as a whole, do not support an inference of a discriminatory purpose in the successful challenge to Hicks. There was no evidence of any pattern of striking African-Americans from the jury, nor was there any evidence that African-Americans were disproportionately represented on the jury compared to the venire or that a disproportionate number of strikes were used against African-Americans. The facts pertaining to the other *Rivera* factors were unremarkable in the overall context of this case. Additionally, the comparison of the jurors in question to Hicks revealed that there were significant and legitimate differences that distinguished Hicks from those jurors, making them a better choice for the State. Under the circumstances, we are unable to say that trial court's determination on remand was clearly erroneous.

## II. The Felony-Murder Instruction

Defendant next argues that the trial court erred when it instructed the jury that it could convict him of murder based on aggravated battery. He maintains that the first degree murder counts were predicated on the same acts as alleged in the aggravated battery count—defendants beat the victim "with their fists, feet and a board." Defendant insists that under the authority of *People v. Morgan*, 197 Ill. 2d 404, 447 (2001), and *People v. Pelt*, 207 Ill. 2d 434, 442 (2003), an aggravated battery count cannot serve as a basis for felony murder when the predicate felony is inherent in the murder itself.

In response, the State contends that the appellate court correctly concluded that any error was harmless under the one-good-count presumption. We agree with the State that any error with the felony-murder instruction was harmless.

Defendant was charged with three different theories of first degree murder—intentional, knowing and felony murder—for the single killing. Our first degree murder statute describes three mental states or conduct that can accompany the acts that cause the murder. A defendant can (1) intend to kill or do great bodily harm to the victim (intentional murder), (2) know that his acts create a strong probability of death or great bodily harm to the victim (knowing murder, also known as strong probability murder), or (3) attempt or commit a forcible felony other than second degree murder (felony murder). See 720 ILCS 5/9—1(a) (West 2004). Here, a general verdict form was submitted to the jury and it returned a general verdict of guilty of first degree murder. Defendant did not object to the general verdict form. It is well settled that when an indictment alleges three forms for a single murder—intentional, knowing and felony murder—and a general verdict is returned, the net effect is that the defendant is guilty as charged in each count and there is a presumption that the jury found that the defendant committed the most serious of the crimes alleged, which is intentional murder. *Morgan*, 197 Ill. 2d at 448; *People v. Cardona*, 158 Ill. 2d 403, 411 (1994); *People v. Thompkins*, 121 Ill. 2d 401, 455 (1988).

In *Morgan*, the defendant was indicted on eight counts for killing his grandparents. The defendant obtained a gun to shoot himself, but instead fired off a shot in his grandparents' bathroom at a bottle. The defendant claimed that he feared for his life when he saw how angry his grandfather became over the incident, so the defendant shot the grandfather. He then shot the

grandmother in the back as she attempted to flee the house. Regarding each victim, the defendant was charged with three separate theories of murder, including first degree murder predicated on aggravated battery. Defendant was found guilty of the first degree murder of the grandmother and the second degree murder of the grandfather. This court held that the trial court erred in instructing the jury on felony murder where the predicate felony arose from and was inherent in the murder. *Morgan*, 197 Ill. 2d at 447-48.

In so holding, this court distinguished *People v. Viser*, 62 Ill. 2d 568 (1975), on the basis that there the charges of felony murder arose from the cause and effect relationship between the crime committed—aggravated battery—and the resulting murder. *Morgan*, 197 Ill. 2d at 446-47. In *Viser*, the victim died of abdominal injuries two weeks after he was beaten by a group of men. *Morgan* found that the "cause and effect relationship between the crime committed and the resulting murder [was] not so clear" in the case before it. *Morgan*, 197 Ill. 2d at 447. *Morgan* noted that it was arguable that "it was not the predicate felonies which resulted in and caused the murders of [the grandparents], but rather it was the murders *** which gave rise to the predicate felonies." *Morgan*, 197 Ill. 2d at 447. This court agreed with the appellate court that every shooting necessarily encompasses conduct constituting aggravated battery and that potentially all fatal shootings could be charged as felony murder predicated on aggravated battery, effectively eliminating the second degree murder statute and the need to prove an intentional and knowing murder in most cases. *Morgan*, 197 Ill. 2d at 447. This court also agreed with the appellate court's holding that "the predicate felony underlying [the] charge of felony murder must have an independent felonious purpose." *Morgan*, 197 Ill. 2d at 458.

Even though this court found error, however, it did not end its analysis there. *Morgan* next found that the error was not a reversible one because the jury returned a general verdict of guilty of first degree murder. *Morgan* noted that it is well settled that " ' "where an indictment contains several counts arising out of a single transaction, and a general verdict is returned[,] the effect is that the defendant is guilty as charged in each count." ' " *Morgan*, 197 Ill. 2d at 448, quoting *People v. Thompkins*, 121 Ill. 2d 401, 455 (1988), quoting *People v. Lymore*, 25 Ill. 2d 305, 308 (1962). A general verdict charging three theories of murder raises the presumption that the defendant committed the most serious crime alleged: intentional murder. *Morgan*, 197 Ill. 2d at 448. Thus, this court in *Morgan* presumed that the jury found defendant guilty of the most serious crime alleged, the intentional murder of the grandmother. *Morgan*, 197 Ill. 2d at 448.

Defendant argues that the one-good-count presumption as set forth in *Morgan* should not apply in this case because here defendant was charged with and convicted of aggravated battery, whereas the defendant in *Morgan* was not. He further complains that the prosecutor emphasized at closing argument that if defendant was guilty of aggravated battery he had to be guilty of felony murder. Defendant also attempts to distinguish *Morgan* on the basis that felony murder predicated on accountability was not an instruction given in *Morgan*. According to defendant, an accountability instruction directs the jury's attention away from other counts of murder by telling it that none of the participants had to intend to kill the victim, but only had to commit aggravated battery.

We do not find defendant's arguments persuasive. In *Cardona*, the defendant was also charged with and convicted of the underlying felony that formed the basis

of the felony-murder conviction and the jury was given an accountability instruction, yet this court still applied the presumption that defendant was guilty of intentional murder when the jury returned a general verdict. *Cardona*, 158 Ill. 2d at 411-13. *Cardona* found that it was enough that there was "sufficient evidence" presented from which it could be concluded that the defendant was guilty, under a theory of accountability, of the offense of murder committed with the intent to kill or do great bodily harm. *Cardona*, 158 Ill. 2d at 412-13. Similarly, as we will explain more fully below, the evidence here was sufficient to show that defendant committed intentional or knowing murder under a theory of accountability.

Defendant additionally points to two juror affidavits that he attached to his posttrial motion to show that the jury relied upon the felony-murder count to reach a guilty verdict of first degree murder. Defendant's reliance on the affidavits, however, is not proper. It is well settled that evidence which relates to the motive, method, or process of deliberations is inadmissible to impeach a verdict. *People v. Nitz*, 219 Ill. 2d 400, 426 (2006).

Finally, defendant relies upon the principle that when one of the theories that the trial court submits to the jury is unconstitutional, the error is not cured by a general verdict. See, *e.g.*, *Stromberg v. California*, 283 U.S. 359, 368-70, 75 L. Ed. 1117, 1122-23, 51 S. Ct. 532, 535-36 (1931) (conviction based on a general verdict could not stand where one of the three possibilities rested on a provision that was unconstitutional under the first amendment); *Williams v. North Carolina*, 317 U.S. 287, 292, 87 L. Ed. 279, 282, 63 S. Ct. 207, 210 (1942); *Sandstrom v. Montana*, 442 U.S. 510, 526, 61 L. Ed. 2d 39, 52, 99 S. Ct. 2450, 2460 (1979); but *cf. Yates v. United States*, 354 U.S. 298, 312, 1 L. Ed. 2d 1356, 1371, 77 S. Ct. 1064, 1073 (1957) (court extended, in *sub silentio* fashion, the holding of *Stromberg* to include nonconstitutional errors).

In *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), the Supreme Court appeared to limit *Stromberg* and its progeny, upon which defendant relies. *Griffin* observed that *Stromberg* "do[es] not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." *Griffin*, 502 U.S. at 53, 116 L. Ed. 2d at 379, 112 S. Ct. at 471. *Griffin* noted that *Stromberg* was based on the fact that the statute in question criminalized conduct that was protected by the first amendment. On the other hand, *Griffin* noted that there was a long historical practice of validating general verdicts returned on multicount indictments where one or more of the counts were legally defective, so long as the general verdict was legally supportable on one of the submitted grounds, even though there was no assurance that the valid ground, rather than an invalid one, was actually the basis of the jury's action. *Griffin*, 502 U.S. at 49-51, 116 L. Ed. 2d at 376-77, 112 S. Ct. at 469-70. Thus, *Griffin* saw a difference between counts that were invalid because they violated a provision of the constitution as opposed to counts that were merely invalid because they were legally defective. In the present case, the felony-murder count would, at most, be legally invalid, not constitutionally invalid.

*Griffin* also discussed at length the Court's decision in *Yates*, which extended the holding in *Stromberg*. *Yates* involved a federal prosecution where one of the counts included in the general verdict was barred by the statute of limitations and thus was simply legally defective, not constitutionally defective. Yet, *Yates* refused to apply the one-good-count presumption. *Griffin* criticized *Yates*, noting that it was an "unexplained extension" of *Stromberg*, and that it did not even invoke the "unlikely basis" of

the due process clause. *Griffin*, 502 U.S. at 55-56, 116 L. Ed. 2d at 380, 112 S. Ct. at 472. In the end, however, the *Griffin* Court noted that its "continued adherence to the holding of *Yates* is not at issue in this case." *Griffin*, 502 U.S. at 56, 116 L. Ed. 2d at 380, 112 S. Ct. at 472. This was because the petitioner in *Griffin* was seeking to set aside the general verdict merely because it was unsupported by sufficient evidence, not because it was unconstitutional as in *Stromberg* or even illegal as in *Yates*. *Griffin*, 502 U.S. at 56, 116 L. Ed. 2d at 380, 112 S. Ct. at 472.

Defendant argues that applying the presumption in this case would violate due process, claiming the challenged instruction allowed a conviction on a nonexistent offense—namely, felony murder predicated on aggravated battery—and this was akin to permitting the jury to convict without finding every element of a valid theory of an offense. Defendant initially cites *Johnson v. United States*, 805 F.2d 1284, 1288 (7th Cir. 1986), *Adams v. Murphy*, 653 F.2d 224, 225 (5th Cir. 1981), and *Evanchyk v. Stewart*, 340 F.3d 933, 941 (9th Cir. 2003), for this proposition. We note, however, that these cases address due process in the context of convictions and punishment for nonexistent crimes. See *Johnson*, 805 F.2d at 1288; *Adams*, 653 F.2d at 224-25; *Evanchyk*, 340 F.3d at 941; see also *Osborne v. Ohio*, 495 U.S. 103, 122-25, 109 L. Ed. 2d 98, 117-19, 110 S. Ct. 1691, 1703-05 (1990). In contrast, felony murder predicated on aggravated battery is a legally existent crime in Illinois. The Code of Criminal Procedure of 1961 expressly defines felony murder predicated on aggravated battery as a crime. See 720 ILCS 5/9—1(a)(3) (West 2006); 720 ILCS 5/2—8 (West 2006). Moreover, this court in *People v. Viser*, 62 Ill. 2d 568, 580 (1975), held that felony murder predicated on aggravated battery is a valid and existing crime under nearly identical circumstances to the present case. *Viser*

has never been overruled by this court, and was essentially reaffirmed by our most recent decision in this area in *People v. Davis*, 213 Ill. 2d 459, 475 (2004). Thus, defendant's argument that there was a due process violation in this case is not supportable based on *Johnson*, *Adams* and *Evanchyk*.

While the instant case was on remand to the trial court for a new *Batson* hearing, the United States Supreme Court decided *Hedgpeth v. Pulido*, 555 U.S. 57, 172 L. Ed. 2d 388, 129 S. Ct. 530 (2008) (*per curiam*). We allowed defendant leave to cite this case as additional authority to support his argument that the one-good-count presumption should not be applied to this case.

In *Pulido*, the defendant was convicted by a California state court jury of felony murder. On direct appeal, the defendant sought to vacate his conviction on the basis that jury instructions erroneously permitted him to be convicted of felony murder if he formed the intent to aid and abet the underlying felony *only after the murder*. The California Supreme Court held that this theory was invalid under California law, but upheld the conviction on the ground that the defendant was not prejudiced by this error. Defendant obtained *habeas* relief in federal district court, which was affirmed by the Court of Appeals, Ninth Circuit. See *Pulido v. Chrones*, 487 F.3d 669 (9th Cir. 2007) (*per curiam*). The court of appeals held that the jury instruction error was a " 'structural error,' " which required that the conviction be set aside "without regard to whether the flaw in the instructions prejudiced the defendant." *Pulido*, 555 U.S. at 58, 172 L. Ed. 2d at 390, 129 S. Ct. at 530.

The Supreme Court vacated the judgment of the court of appeals and remanded the cause to determine if the defendant was prejudiced by the error. *Pulido*, 555 U.S. at 62, 172 L. Ed. 2d at 392, 129 S. Ct. at 533. The Supreme Court noted that the court of appeals had based

its "structural error" analysis upon *Stromberg*, which addressed the validity of a general verdict that rested on an instruction that indicated that the defendant could be found guilty of constitutionally protected conduct. *Pulido*, 555 U.S. at 60, 172 L. Ed. 2d at 391, 129 S. Ct. at 531. *Pulido* then observed that *Yates* extended the reasoning of *Stromberg* to a conviction resting on multiple theories of guilt when one of those theories is not unconstitutional, but is otherwise legally flawed. *Pulido*, 555 U.S. at 60, 172 L. Ed. 2d at 391, 129 S. Ct. at 531-32. The Supreme Court in *Pulido* did not discuss *Griffin* and its criticism of *Yates*. Moreover, the issue before the Supreme Court in *Pulido* did not involve the full scope of the *Stromberg* rule or the continued viability of the one-good-count presumption. Instead, the limited issue was whether a *Stromberg/Yates* type error is a "structural error" that requires automatic reversal or whether such an error is instead subject to a harmless-error analysis. Relying upon analogous cases, the Supreme Court in *Pulido* easily concluded that in cases where a jury is instructed on multiple theories of guilt, one of which is improper, a harmless-error analysis is applicable. *Pulido*, 555 U.S. at 60-61, 172 L. Ed. 2d at 391, 129 S. Ct. at 532 (citing *Neder v. United States*, 527 U.S. 1, 10-11, 144 L. Ed. 2d 35, 47-48, 119 S. Ct. 1827, 1834-35 (1999) (omission of material element from jury instructions was harmless), *California v. Roy*, 519 U.S. 2, 136 L. Ed. 2d 266, 117 S. Ct. 337 (1996) (erroneous aider and abettor instruction), *Pope v. Illinois*, 481 U.S. 497, 95 L. Ed. 2d 439, 107 S. Ct. 1918 (1987) (misstatement of an element of an offense), and *Rose v. Clark*, 487 U.S. 570, 92 L. Ed. 2d 460, 106 S. Ct. 3101 (1986) (erroneous burden-shifting as to an element of an offense)); *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (constitutional errors can be harmless).

The Court continued its analysis by stating as follows:

"[W]e emphasized in *Rose* that 'while there are some errors to which [harmless-error analysis] does not apply, they are the exception and not the rule.' [Citation.] And *Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiat[e] *all* the jury's findings." ' [Citation.] An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted.

In fact, drawing a distinction between alternative-theory error and the instructional errors in *Neder, Roy, Pope,* and *Rose* would be 'patently illogical,' given that such a distinction ' "reduces to the strange claim that, because the jury ... received both a 'good' charge and a 'bad' charge on the issue, the error was somehow more pernicious than ... where the *only* charge on the critical issue was a mistaken one." ' [Citations.]" (Emphases in original.) *Pulido,* 555 U.S. at 61, 172 L. Ed. 2d at 391-92, 129 S. Ct. at 532.

In so finding, the *Pulido* Court emphasized that both *Stromberg* and *Yates* were decided before *Chapman* concluded that constitutional errors can be harmless. *Pulido,* 555 U.S. at 60, 172 L. Ed. 2d at 391, 129 S. Ct. at 532. Accordingly, neither *Stromberg* nor *Yates* had any reason to address whether the errors they identified could be reviewed for harmlessness, or instead required automatic reversal. *Pulido,* 555 U.S. at 60, 172 L. Ed. 2d at 391, 129 S. Ct. at 532.

We note that defendant after remand has cited our recent decision in *People v. Smith,* 233 Ill. 2d 1 (2009), to support his argument that the one-good-count rule should not apply to insulate from review any error with respect to the felony-murder instruction. He also claims that *Smith* supports his contention that any such alternate-theory instructional error should not be subject to a harmless-error analysis. We find *Smith* inapplicable to the present case.

*Smith* involved a defendant who was charged with three theories for a single murder (intentional, knowing

and felony murder), plus the underlying felony of attempted armed robbery. He specifically requested a special verdict form, but that request was denied by the trial court. A general verdict form was then used, and the jury returned a general verdict of guilty of murder. At sentencing, the trial court found that the defendant clearly committed intentional murder. The court imposed a 60-year sentence for murder *and a consecutive* 8-year sentence for attempted armed robbery. The appellate court observed that had the jury found defendant guilty of felony murder premised on attempted armed robbery and not guilty of both intentional and knowing murder, defendant would not have been eligible to be sentenced to a consecutive sentence on the attempted armed robbery conviction. *People v. Smith*, 372 Ill. App. 3d 762, 771 (2007). The appellate court found it was error to refuse the defendant's request for a special verdict form in such a case, but nevertheless affirmed the murder conviction and modified the eight-year sentence to run concurrently. *Smith*, 372 Ill. App. 3d at 771-72.

This court in *Smith* affirmed the murder conviction, but vacated the conviction and sentence for attempted armed robbery. In so doing, this court's holding was narrow: "where, as here, specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided *upon request* and the failure to provide them is an abuse of discretion." (Emphasis added.) *Smith*, 233 Ill. 2d at 23. This court was also careful to note that the defendant was not arguing that his convictions for murder should be set aside and was not repudiating the "one good count rule." *Smith*, 233 Ill. 2d at 22-23. This court concluded by finding that the error of refusing the defendant's request where it could ultimately be key to his receiving more severe sentencing was not subject to a harmless-error analysis. *Smith*, 233 Ill. 2d at 23, 25.

The present case is a world away from *Smith*. Here, defendant did not object to the general verdict form and did not request a special verdict form. Again, the holding of *Smith* was conditioned on the trial court's refusal to grant such a request and did not establish a rule that the court must act *sua sponte* to give a specific verdict form. Additionally, defendant is challenging the validity of the one-good-count rule, something which was expressly not done in *Smith*. Finally, we note that *Stromberg*-like errors, such as the one here, have now been specifically held by the United States Supreme Court to be subject to a harmless-error analysis and are not structural defects that require automatic reversal. *Pulido*, 555 U.S. at 60, 172 L. Ed. 2d at 391, 129 S. Ct. at 532.

Turning to the case before us, we note that even if we were to find that a constitutional due process error occurred in instructing the jury on felony murder or that the one-good-count presumption is questionable, it would still not require automatic reversal of defendant's murder conviction. See *Pulido*, 555 U.S. 57, 172 L. Ed. 2d 388, 129 S. Ct. 530; *Chapman*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824. The Supreme Court has applied a harmless-error analysis to a wide variety of errors and has recognized that most constitutional errors are subject to a harmless-error analysis. See, *e.g.*, *Pulido*, 555 U.S. at 61-62, 172 L. Ed. 2d at 391-92, 129 S. Ct. at 532; *Neder*, 527 U.S. at 10-11, 144 L. Ed. 2d at 47-48, 119 S. Ct. at 1834-35 (omission of material element from jury instructions was harmless). Accordingly, we hold that the instant felony-murder instruction, even if erroneous, was a typical trial error that did not amount to a structural defect that required automatic reversal. It would be analogous to the *Apprendi* cases that we have decided such as *People v. Nitz*, 219 Ill. 2d 400 (2006), and *People v. Thurow*, 203 Ill. 2d 352 (2003), where we found that the error of not submitting every essential element of an offense to the

jury for consideration was subject to either a harmless-error analysis if defendant made a trial objection or a plain-error analysis if defendant did not object. Under plain-error review, which is applicable to this case due to defendant's lack of an objection at trial,[3] the defendant has the burden to persuade the court that the error was prejudicial, that is, defendant must show that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *Nitz*, 219 Ill. 2d at 410, 414.

Again, we note that in the case before us, defendant did not object to the general verdict form, nor did he object to the felony-murder instruction on the basis that it was improperly predicated on aggravated battery. Thus, a plain-error analysis is appropriate, assuming *arguendo* that defendant is correct in his contention that a straightforward application of the one-good-count presumption would be faulty.

It is axiomatic that a defendant is legally accountable for the crimes of his codefendants where defendant aids and abets the commission of those crimes during their actual commission. Here, defendant was legally accountable for the actions and mental states of his codefendants. The two good counts—the intentional and strong probability murder counts—only required the State to prove that defendant, or one for whom he was legally accountable, either intended to do great bodily harm to the victim or knew that his acts that caused the death created a strong probability of great bodily harm. See 720 ILCS 5/9—1(a)(1), (a)(2) (West 2004). Here, the record

---

[3]See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("Both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during the trial" (emphasis omitted)). This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

shows that defendant and his co-assailants repeatedly beat the victim until he reached a state of unconsciousness. After defendant saw the victim lapse into unconsciousness, defendant picked him up and threw him into a dumpster. Defendant acknowledged, and it was undisputed, that he acted as a lookout to facilitate the beating, during which Edward Durant (Pee Wee) intentionally struck the victim several times with a piece of lumber. The brain injuries suffered by the victim were so serious that he never came out of his coma before dying. Under these circumstances, we conclude that the evidence of intentional and strong probability murder based on accountability was not closely balanced, and therefore any error in instructing the jury on felony murder was harmless.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed defendant's convictions and sentence.

*Affirmed.*