2020 IL App (1st) 162644-U

THIRD DIVISION
June 30, 2020

No. 1-16-2644

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 3934 |
| | ) | |
| JAMAL DAVIS, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justices Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County; this court is without jurisdiction to address defendant's argument that the trial court erred in denying his motion to dismiss the felony murder charges where defendant was only sentenced on intentional murder; the trial court was not required to *sua sponte* instruct the jury on independent felonious purpose with respect to the felony murder charge, defendant did not receive ineffective assistance of counsel; and the record is insufficient to review defendant's as-applied constitutional sentencing challenges raised for the first time on direct appeal.

¶ 2    Following trial, a jury returned a general verdict form finding defendant guilty of first degree murder for the death of John Wallace while armed with a firearm.  Defendant had been indicted on three versions of first degree murder (intentional; strong probability; and felony murder while committing home invasion or aggravated discharge of a firearm) on an

accountability theory. Defense counsel did not object to the use of a general verdict form nor was request made for the jury to be given instruction on an independent felonious purpose with respect to the felony murder charges. Defendant was sentenced to 35 years' imprisonment for first degree murder and the court found a 15 year enhancement applied to his sentence based on the jury's finding that the individual for whom defendant was accountable was armed with a firearm in the commission of the offense. All of defendant's convictions were merged into the intentional murder conviction.

¶ 3     On appeal defendant argues his conviction should be reversed and his case remanded for a new trial because: (1) the trial court erred in denying his motion to dismiss the felony murder charges; (2) the trial court erred in failing to instruct the jury on an independent felonious purpose (IFP) which he argues is an element of felony murder; and (3) because he received ineffective assistance of counsel. Alternatively, defendant argues his 50-year prison sentence for first degree murder violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. For the reasons set forth below, we affirm the trial court's judgment.

¶ 4                                    BACKGROUND

¶ 5     The charges against defendant, Jamal Davis, arose from the September 1, 2013 shooting death of John Wallace. Defendant was charged along with two co-defendants (Victor Willis and Charles McKinney) with first degree murder of Wallace. Victor was found guilty in a separate jury trial and Charles was found not guilty in a joint but severed jury trial with defendant. Neither of these co-defendants are party to this appeal.

¶ 6     Defendant's indictment alleged three versions of first degree murder: (1) intentional; (2) strong probability; and (3) felony while committing a home invasion or an aggravated discharge of a firearm.

¶ 7                              Trial Testimony

¶ 8     Defendant, who was age 21 on September 1, 2013, was close friends with Pete Green. Pete resided with his mother, Joann Green, and his brother, Marecko Green, in the basement apartment of a three-flat dwelling located at 6438 South Morgan Street (Morgan Street home). Defendant and Pete hung out daily and Pete described defendant as being like a brother to him.

¶ 9                  Altercation Prior to September 1, 2013 Shooting

¶ 10    A week prior to the September 1, 2013 shooting, defendant and Pete were on Pete's porch drinking with Pete's sister, Tequila Green, and Pete's girlfriend, Keisha. An argument ensued between Tequila and defendant. Pete spoke to his sister and then asked defendant why he was disrespecting Tequila. Keisha then walked up to defendant, gabbed his shirt and said he was not going to "slap [her] sister-in-law like that." Pete grabbed Keisha and moved her away. While Pete was holding Keisha, defendant struck Keisha from behind. Pete told defendant to leave.

¶ 11    Pete called defendant that night to discuss this incident. Defendant told Pete "Man, if you want to turn into another thing, I got my family and got my guys and you have yours." Defendant's tone changed at which point he told Pete to "watch out." After the phone call, Pete did not see or hear from defendant, but admitted telling defendant not to come back to his house.

¶ 12                             September 1, 2013 Shooting

¶ 13    On September 1, 2013, Pete was on his porch with his brother Marecko, his nephew Monte, and Monte's two friends, Katelynn Kordas and Amanda Zegers, as well as some other

friends. Later that afternoon defendant and his girlfriend, Tameka Cleveland, arrived at the Morgan Street home in Tameka's gold van. Defendant got out of the van and said that he heard people were looking for him but that "he ain't worried about nothing." Defendant and Tameka eventually left, but returned later that day with defendant's brother, Cornell. This time, defendant stepped onto the porch and began drinking with some of the people in the group. Pete and defendant never spoke but exchanged glances. Pete denied there was tension between him and defendant but acknowledged that he felt disrespected by defendant not apologizing for their prior argument.

¶ 14    Pete's mother, Joann, came outside and asked everyone to leave the porch and go across the street. Monte, Marecko, Katelynn, and Amanda went across the street to the porch of an abandoned house. Defendant and his brother, Cornell, stayed behind on Pete's porch. Marecko got angry and told everyone to leave the front of their house. Defendant replied that this is his block and he "ain't got to go nowhere." Marecko said that if they did not move, he was going to throw a bottle over there, and it would hit whomever it would hit.

¶ 15    Pete testified he heard defendant reply "I'll be back. I'm finna come back with 50 motherfuckers to shoot the block up." Another witness heard this reply to be "he will be back with 50 n***** to shoot the porch up" but that this was not said directly to Pete or his family. The witness further testified that defendant said "we do what the fuck we want to do" and "I'll be back." Amanda only heard defendant say "I am going to take my baby home, I will be back." Defendant walked back to Tameka's van and the two drove off. Cornell remained on the porch, but after defendant's departure he received a call. He was on the phone for a short time, got off the phone and left without saying anything. Cornell went over to the abandoned porch with Marecko. Pete decided to go into the house because Cornell's tone on the phone sounded

suspicious to him. Keisha joined Pete and the two went into the first floor apartment of the Morgan Street home where his sister, Tequila lived.

¶ 16 At approximately 11:00 p.m. the victim, John Wallace, who was Pete's close family friend, arrived at the Morgan Street home. John entered the home and went downstairs. Approximately 20 minutes later defendant returned to the Morgan Street home in the passenger seat of Tameka's van. Tameka parked the van on the east side of the street. Co-defendants, Charles McKinney and Victor Willis, defendant's cousins, got out of the sliding door in the back of the van. Victor exited the van with a .9 millimeter black semiautomatic handgun with an extended clip and walked straight to the porch of the Morgan Street home. Defendant exited the van and along with Charles followed Victor. Tameka testified Victor was never in her van that evening. Instead, a red car had parked behind her and she saw Victor coming from that direction.

¶ 17 Victor approached the front of the porch with Charles and defendant following and in an aggressive tone and stated "Where [Pete's] bitch ass at?" Marecko and others did not take him seriously and began laughing. Amanda heard Victor say "You want to play with guns, you think it is funny, you think it is a joke?" Another witness heard Victor state "motherfuckers think I'm playing. Where is [Pete]?" while another heard "Y'all must think I'm playing." As Victor approached the front door he continued asking for Pete but nobody responded. While Victor was on the porch defendant and Charles remained at the bottom of the stairs. Defendant did not say anything and was standing on the sidewalk a few feet from Marecko while Charles stood directly behind Marecko.

¶ 18 Victor began beating the front door of the Morgan Street home and twisted the doorknob which was locked. Eventually, John opened the door from inside and Victor asked "Where

[Pete] bitch ass at?" John responded "What you want with him?" Victor said "Man, go get [Pete]." Victor had the gun in his right hand at his waist and was pointing at John's face with his left hand. John looked at Victor's hand with the gun and then closed the door on him. Victor mumbled to himself, opened the door, and started shooting. Victor ran into the hallway and shot several more times. Tameka testified she saw Victor shooting with his arm inside the front doorway and when the shooting started she told defendant to get in the van.

¶ 19    From inside the first floor apartment, Pete heard a strange voice in the hallway near the entrance door asking "Where [Pete] bitch ass at?" Pete was going to open the door, but Keisha stopped him. Then Pete heard gunshots. Pete peeked out the door and saw Victor shooting into the house and quickly shut the door. Victor was facing into the basement and firing. Thereafter, Pete heard a car take off from in front of the house.

¶ 20    Joann was sitting in the chair by the stairs when she heard John say "Who is it?" and "What you want with him?" She did not hear anything further and saw John on his way back downstairs to her apartment. She then heard gunshots, grabbed her grandchildren and hid in the closet where she heard additional gunshots. Joann called the police from the closet and could hear John running and staggering down the stairs.

¶ 21    When Victor started shooting people began running off the porch. Marecko stayed on the sidewalk during the shooting and saw Victor shooting repeatedly in the hallway after which he ran right past Marecko back to Tameka's van. He then saw Charles run up holding a silver gun from which he fired multiple shots before also running past Marecko and back to Tameka's van. Defendant was still standing next to Marecko and said "Well, motherfuckers wanna play with guns" before running toward Tameka's van, getting in and leaving the scene. Katelynn testified defendant made a similar statement before the shooting.

¶ 22    When Marecko entered the Morgan Street house he ran downstairs and found John lying face down, unresponsive on his mother's kitchen floor.  Paramedic Robert Kay responded to the shooting at 11:30 p.m. where he found John who was not breathing and had no pulse.  A subsequent autopsy revealed John's cause of death was a homicide resulting from multiple gunshot wounds: one to his left back which exited his right chest; one to his right back which exited through his lower right chest; a third on the back of the right thigh; and a fourth to the upper right arm.

¶ 23    Police gathered evidence at the scene which showed at least two gunshots through the basement apartment door, at least one shot through the drywall of the basement stairs' hallway, two shell casings were found in the building's foyer hallway with the remainder found on a ledge on the side of the basement apartment's hallway.  Pete spoke to police that night and gave them the names of defendant, Victor, and Charles.  On September 7, 2013, Marecko went to the police station to discuss the shooting.  Marecko claimed while at the station he received a call from defendant directing Marecko "not to snitch" and that they "will handle it on the streets."  Victor, Charles, and defendant were all subsequently arrested.

¶ 24                                Pretrial Proceedings

Prior to the commencement of trial, defendant filed a motion to dismiss the felony murder count. In his motion defendant argued the State's burden is lower to sustain a conviction for felony murder rather than intentional murder because in a felony murder case the state only has to prove intent to commit the underlying felony, not intent to kill.  Therefore, the State is required to prove defendant had an independent felonious purpose (IFP) other than the murder of the victim itself.  Defendant argued that felony murder was not appropriate because the predicate felonies, home invasion and aggravated discharge of a firearm, were not independent of the murder itself

and thus no IFP existed to support the felony murder charge. The trial court denied defendant's motion without prejudice reasoning "it is at least conceivable that when Victor Willis walked up to the house, he only possessed the intent to enter the house and/or fire a handgun, but then became frustrated that John Wallace would not let him inside and subsequently made the decision to murder [John]." The trial court wrote it remained to be seen whether the State could prove an IFP and it would "not hesitate to dismiss or enter a directed finding on the felony murder counts if the State's evidence does not support this intent. However, at this early stage of the proceedings, there is sufficient evidence to sustain felony murder counts and move this case forward."

¶ 25                    Motion for Directed Finding and Renewed Motion to Dismiss

¶ 26    At the close of the State's case, the defense made a motion for directed finding arguing the State had not proven the elements of felony murder. The trial court denied the motion. Defense then renewed its pretrial motion to dismiss felony murder counts because the predicates lacked an IFP from the murder. The trial court denied the renewed motion concluding the facts of the case could show that Victor initially had the intent only to commit aggravated discharge which then changed to an intent to kill stating:

> "That the jury could reasonably find independent felonious intent with respect to those counts, and that the murder counts could stand separate and apart from the home invasion and aggravated discharge of a firearm. A jury could find that the evidence supports such an independent felonious intent because there are any number of ways the shooting could have been as counsel argued. The intent could have been formed [] immediately when he started shooting, he was forming the intent to kill. It could have. The jury could also[,] based on the evidence[,]

find that at that particular time when he first started shooting the intent was not formed or that even when he first returned or came to the location that the intent was not – intent to kill was not yet formed."

¶ 27     Referencing the wound evidence, the trial court further found:

"[T]here is at least some evidence of an independent felonious intent that would permit the felony murder charges to survive dismissal, and so because there are reasonable possibilities under the evidence presented now at trial for the jury to find those independent felonies separate and apart from murder, the Defendant's motion to dismiss [is] again denied."

¶ 28                         Jury Verdict and Sentencing

¶ 29     The defense did not object to any of the felony murder related jury instructions. The jury was given Illinois Pattern Jury Instructions (IPI) 5.03, 5.03A, 7.01, 7.02, and 7.15A along with a general verdict form.

¶ 30     After 75 minutes of deliberation, the jury found defendant guilty of first degree murder while armed with a firearm. Defense counsel filed a motion for new trial arguing the trial court erred in not dismissing the felony murder counts due to the lack of an IFP and for allowing the felony murder counts to go to the jury. The court denied the motion without elaborating on the basis of its ruling.

¶ 31     Thereafter, the trial court merged all of the murder counts into count one, intentional murder and sentenced defendant to 35 years for first degree murder with a 15-year enhancement based on Victor's being armed with a firearm for a total of 50 years in the Illinois Department of Corrections. Defendant filed a motion to reconsider sentence which was denied. Defendant did

not raise any eighth amendment constitutional challenges or argue his sentence violated the proportionate penalties clause of the Illinois Constitution.

¶ 32     This appeal followed.

¶ 33                              ANALYSIS

¶ 34     On appeal defendant argues his conviction should be reversed and his case remanded for a new trial because: (1) the trial court erred in denying his motion to dismiss the felony murder charges; (2) the trial court erred in failing to instruct the jury on an IFP which he argues is an element of felony murder; and (3) because he received ineffective assistance of counsel where trial counsel (a) did not request the jury be instructed on an IFP and (b) did not request a separate verdict form for first degree murder.  Alternatively, defendant argues his 50-year prison sentence for first degree murder violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution.  We address each of defendant's arguments below.

¶ 35                    Motion to Dismiss Felony Murder Charges

¶ 36     We first address defendant's argument the trial court erred in denying his posttrial motion to dismiss the felony murder charges notwithstanding the jury's general guilty verdict for first degree murder.  Defendant argues there was no IFP "for Victor Willis, the party [defendant] was accountable for, to enter the front door of [the Morgan Street home] and discharge his firearm other than to murder John Wallace, who had just closed the door in Victor's face."  Defendant reasons this is because "[t]he acts that constituted the predicate felonies (aggravated discharge of a firearm and home invasion) were inherent in the act of murder" and thus "lowered the State's burden of proof in violation of [defendant's] federal due process rights."

¶ 37    In response, the State argues this court is without jurisdiction to review defendant's argument that the trial court erred when it did not grant defendant's motion to dismiss the felony murder charge. The State points out that the defendant was sentenced for intentional murder and was not sentenced for felony murder. Citing *People v. Relerford*, 2017 IL 121094, ¶ 75, the State argues that because no final judgment was entered on the felony murder charge there is no final and appealable judgment. We agree with the State's contention.

¶ 38    In this case, the defendant was charged with intentional, strong probability, and felony murder arising out of a single transaction. Defendant was found guilty on a general verdict form. The jury's general verdict finding defendant guilty of first degree murder raised a presumption that the jury found defendant committed the most serious of the crimes alleged, which is intentional murder.

> "It is well settled that when an indictment alleges three forms for a single murder–
> intentional, knowing and felony murder–and a general verdict is returned, the net
> effect is that the defendant is guilty as charged in each count and there is a
> presumption that the jury found that the defendant committed the most serious of
> the crimes alleged, which is intentional murder." *People v. Davis*, 233 Ill. 2d 244,
> 263 (2009); see also *People v. Morgan*, 197 Ill. 2d 404, 448 (2001).

Where a general first degree murder guilty verdict is returned, conviction is to be made only on the most serious charge of murder – intentional murder – and sentence is to be imposed on that offense. *People v. Cardona*, 158 Ill. 2d 403, 411-12 (1994).

¶ 39    The trial court sentenced defendant for the most serious charge, intentional murder, and merged the other counts. As such, defendant was not sentenced for felony murder.

¶ 40    In *Relerford*, 2017 IL 121094, our supreme court held the appellate court is without jurisdiction to decide the validity of unsentenced convictions. *Id*. at ¶¶ 71-75. In that case, the defendant was charged and convicted of two counts of stalking and two counts of cyberstalking. *Id*. at ¶ 3. Defendant was convicted on all counts but was sentenced only for stalking. *Id*. at ¶ 14. No explanation was given for the trial court's failure to impose a sentence on the remaining three convictions. *Id*. at ¶ 74. On appeal the appellate court vacated defendant's stalking conviction for which he was sentenced but then considered the merits of defendant's unsentenced convictions. *Id*. at ¶ 15. Our supreme court; however, held the appellate court lacked jurisdiction to consider the merits of the unsentenced conviction finding the appellate court's reliance on *People v. Dixon*, 91 Ill 2d. 346 (1982), to conclude it had jurisdiction to address the defendant's unsentenced convictions misplaced. *Relerford*, 2017 IL 121094, ¶¶ 71, 74. The supreme court explained that (1) the situation in *Dixon* must be understood to be limited to situations where a trial court failed to sentence the defendant on lesser offenses incorrectly believing they merged into other sentenced offenses and (2) *Dixon* must be given a narrow interpretation reasoning that, "A close reading of *Dixon* makes clear that, to the extent the appellate court had any jurisdiction to address the nonfinal convictions, that jurisdiction was limited to ordering a remand for imposition of sentence on the lesser convictions." *Id*. at ¶¶ 74-75.

¶ 41    In this case, although defendant was charged with felony murder, the trial court properly did not sentence him for felony murder – only intentional murder. See *People v. Calhoun*, 404 Ill. App. 3d 362, 380 (2010) (noting " '[T]he one-good-count principle has long been employed to permit enhanced sentencing *** by construing a general first degree murder verdict as a finding of guilt on an intentional murder charge." (Quoting *People v. Moore*, 397 Ill. App. 3d

555, 566 (2009)); see also *Cardona*, 158 Ill. 2d 403, 411-12. We hold, therefore, that this court lacks jurisdiction to determine the merits of defendant's unsentenced felony murder conviction or to address whether the trial court erred when it did not dismiss the felony murder charges. See *Relerford*, 2017 IL 121094, ¶¶ 71-75. To the extent the appellate court has any jurisdiction to address nonfinal convictions, that jurisdiction is limited to ordering a remand for imposition of a sentence on lesser convictions." See *id*. at ¶ 75.

¶ 42 Defendant further argues this interpretation of *Relerford* cannot be correct otherwise "the Court in *Davis*[, 233 Ill. 2d 244] never would have addressed the contentions of a lack of IFP" on the defendant's unsentenced felony murder conviction which merged into the intentional murder conviction for which the defendant was sentenced. However, *Davis* can be distinguished. In *Davis*, the defendant was charged with felony murder and aggravated battery based on the same conduct and ultimately found guilty on both charges, *id*. at 247, whereas here, defendant was not separately charged on the predicate felony to the felony murder charge. The issue raised in *Davis* was whether the trial court erred by instructing the jury that it could convict him of murder based on aggravated battery where defendant argued the first degree murder counts were predicated on the same acts as alleged in the aggravated battery count. *Id*. at 263. We conclude this court does not have jurisdiction to weigh the merits of the unsentenced felony murder conviction.

¶ 43                                    Instructional Error

¶ 44 Defendant also argues the trial court erred by not instructing the jury on an IFP for felony murder. In response, the State argues "defendant has forfeited this claim by not objecting at trial or including it in his posttrial motion." Defendant acknowledges this claim was not raised in the trial court, but argues review is warranted under the second prong of the plain error doctrine.

¶ 45    Failure to object at trial to an error in jury instructions and raise it in a posttrial motion generally results in forfeiture of that issue on appeal. *People v. Herron*, 215 Ill. 2d 167, 175 (2005); *People v. Thurman*, 104 Ill. 2d 326, 329 (1984); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (error must be both objected to and included in posttrial motion in order to be preserved). However, Supreme Court Rule 451(c) provides an exception to this rule "for substantial defects" applicable "when there is a grave error or when the case is so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004); see also Ill. S. Ct. R. 451 (eff. April. 8, 2013) (stating "substantial defects are not waived by failure to make timely objections [to a jury instruction] if the interest of justice require"). Supreme Court Rule 615(a) further states "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615 (eff. Jan. 1, 1967).

> "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Herron*, 215 Ill. 2d at 187.

¶ 46    The alleged error can only be considered if: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). While defendant argues the second prong of the plain error test applies here, as explained below, there first must be a clear and obvious error. We find none.

¶ 47 The first step under both prongs of the plain error analysis is to determine whether error occurred in the giving of the jury instruction. *Id.* Even where error is found in the instruction, "the erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hopp*, 209 Ill. 2d at 8. Thus, our supreme court has found that "even an incorrect instruction on an element of the offense is not necessarily reversible error." *Id*. at 10. This is true where the defendant would have been found guilty even if correct instructions had been given and the defendant failed to object to the instruction. *People v. Jones*, 81 Ill. 2d 1, 7 (1979). Notwithstanding, we conclude our plain error analysis ends at the first step of our inquiry because we find no clear or obvious error occurred and, as such, there can be no plain error. See *Piatkowski*, 225 Ill. 2d at 565; see also *Calhoun*, 404 Ill. App. 3d at 382 (Stating, "Since there was no error, there can be no plain error.").

¶ 48 "It is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury." *People v. Tuner*, 128 Ill. 2d 540, 562 (1989). "In criminal cases, however, this rule is modified in certain situations by the requirements of a fair trial" wherein the trial court "bears the burden of seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." *People v. Parks*, 65 Ill. 2d 132, 137 (1976).

¶ 49 In accordance with Supreme Court Rule 451(a), the jury was provided five Illinois Pattern Jury Instructions, Criminal (IPI): (1) IPI 7.01 defining first degree murder; (2) IPI 11.53 defining home invasion; (3) IPI 18.11 defining aggravated discharge of a firearm; (4) IPI 1.72 outlining the element for first degree murder including intentional, strong probability, and felony

murder; and (5) IPI 5.03A outlining felony murder on an accountability theory. See Ill. S. Ct. R. 451(a) (eff. April 8, 2013) (stating IPIs shall be used unless the court determines that it does not accurately state the law). The definitional and directional IPIs given to the jury in this case properly instructed the jury on (1) the elements of the crime charged - including felony murder and the predicates to the felony murder at issue – aggravated discharge of a firearm and home invasion; (2) the presumption of innocence; and (3) the question of burden of proof. The trial court instructed the jury on each element of the crimes charged, accordingly, we cannot say the trial court was required to *sua sponte* provide an instruction in IFP. See *Parks*, 65 Ill. 2d at 137.

¶ 50    Further support for our conclusion here can be found in *People v. Colbert*, 2013 IL App (1st) 112935, ¶ 21 where this court determined "the trial court, rather than the jury, must examine the factual context surrounding the murder and determine whether the evidence is sufficient to show that the predicate felony has an independent felonious purpose apart from the murder itself." *Id.* In *Colbert*, as in this case, there is no error for failure to instruct the jury on IFP where the trial court made the determination that an IFP existed. See *id*.

¶ 51    While we find no clear or obvious error occurred here, we point out that our supreme court has found that "even an incorrect instruction on an element of the offense is not necessarily reversible error." *Hopp*, 209 Ill. 2d at 10. This is true where the defendant would have been found guilty even if correct instructions had been given and the defendant failed to object to the instruction. See *Jones*, 81 Ill. 2d at 7-10 (finding jury instructions erroneously directing on the required mental state of the offense for which the defendant was convicted did not constitute a "grave or substantial error" where the requisite intent was "blatantly evident from the circumstances"). In *Davis*, 233 Ill. 2d at 262-66, the defendant raised instructional error similar

to that raised in this case. There court found that the absence of an IFP instruction and a general verdict was not a structural error requiring reversal. *Id*. at 273. The court held:

> "[E]ven if we were to find that a constitutional due process error occurred in instructing the jury on felony murder or that the one-good-count presumption is questionable, it would still not require automatic reversal of defendant's murder conviction. [Citation.] The Supreme Court has applied a harmless-error analysis to a wide variety of errors and has recognized that most constitutional errors are subject to a harmless-error analysis. [Citations.] Accordingly, we hold that the instant felony-murder instruction, even if erroneous, was a typical trial error that did not amount to a structural defect that required automatic reversal." *Id*.

¶ 52    Our supreme court has held instructional errors are subject to either a harmless-error analysis if defendant made a trial objection or a plain-error analysis if defendant did not object. Under plain-error review, which is applicable to this case, due to defendant's forfeiture, the defendant has the burden to persuade the court that the error was prejudicial, that is, defendant must show that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *People v. Nitz*, 219 Ill. 2d 400, 410 (2006).

¶ 53    Following *Davis* we examined the record and conclude the evidence is overwhelming that defendant is guilty of intentional first degree murder on an accountability theory. A defendant can be found guilty on a theory of accountability if the State can prove *either* (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. As set forth below, (infra ¶¶ 65-67), the record support defendant's intentional murder conviction. Defendant was responsible for bringing Victor to Pete's residence making good on his earlier threat that "he will be back with

50 n***rs to shoot the porch up." Upon arrival, an armed Victor went to the Morgan Street home asking for Pete. Defendant was present and was standing behind Victor. The victim, who was uninvolved in the dispute, answered the door and was subsequently shot by Victor multiple times causing his death as was witnessed by several individuals present at the scene. Based on this record, defendant has not sustained his burden to persuade us he was prejudiced by the alleged erroneous instructions.

¶ 54                           Ineffective Assistance of Counsel

¶ 55    Respondent next argues his trial counsel was ineffective because she (a) did not request the jury be instructed on IFP and (b) did not request a separate verdict form for first degree murder. Because we have found that we do not have jurisdiction to address defendant's unsentenced felony murder conviction, we will consider his arguments in the context of being procedural steps which led to his intentional murder conviction.

¶ 56    Claims of ineffective assistance of counsel not raised in the trial court are reviewed *de novo*. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 46. Criminal defendants have a constitutional right to effective assistance of counsel and claims alleging ineffective counsel are governed by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (2004). *People v. Veach*, 2017 IL 120649, ¶ 29.

> " 'To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate [1] that counsel's performance was deficient and [2] that the deficient performance prejudiced the defendant.' [Citation.] Specifically, 'a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different." ' [Citation.] 'A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." ' [Citation.] 'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' [Citation.]" *Veach*, 2017 IL 120649, ¶ 30.

¶ 57    As to the first prong of the two prong *Strickland* test set forth above,

"defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy. [Citations.] The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts. [Citation.] Because effective assistance refers to competent and not perfect representation [citation], mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent [citation]." *Calhoun*, 404 Ill. App. 3d at 383.

¶ 58    "[I]f the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient." *People v. Morgan*, 187 Ill. 2d 500, 530 (1999).

¶ 59    We address each of defendant's claims as to ineffective assistance of counsel and disagree that defendant has satisfied *Strickland's* two-prong test.

¶ 60                          (a) No Request Jury Be Instructed On IFP

¶ 61    First, we disagree that defendant received ineffective assistance of counsel because trial counsel did not request the jury be instructed on IFP. Here, we do not make any findings as to whether trial counsel's actions in not requesting a jurying instruction on IFP constituted deficient

performance, rather, we find that defendant suffered no prejudice. See *Morgan*, 187 Ill. 2d at 530 (holding that were an "ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient.") As to the prejudice prong of the *Strickland* analysis, we conclude there is no reasonable probability here that the result of the proceeding would have been different had the jury been instructed on IFP. See *Veach*, 2017 IL 120649, ¶ 30.

¶ 62    Defendant was charged with intentional; strong probability; and felony murder. The jury returned a general guilty verdict and thus, his convictions on all three variations of first degree murder merged into intentional murder on which defendant was ultimately sentenced. See *Morgan*, 197 Ill. 2d at 448; *Davis*, 233 Ill. 2d at 263-67. Thus, in order for defendant to have suffered prejudice, we would have to conclude that, based on this IFP instruction, the jury would still not have found defendant guilty of intentional murder. See *id*.

¶ 63    As stated earlier, our supreme court in *Fernandez*, 2014 IL 115527, ¶ 21, explained that under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense showing *either* (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design. *Id*. In common design rule cases in which "the defendant sets out to promote or facilitate the commission of a crime *** the rule is and remains that *** he is legally accountable for the conduct of the person he aids; and that 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." (Internal quotations omitted and emphasis in original.) *Id*.

¶ 64    Here, the jury was instructed on first degree and felony murder as follows:

   IPI 7.02 Issues In First Degree Murder (When Second Degree Murder Is Not Also An

   Issue) stating:

"To sustain the charge of first degree murder, the State must prove the following propositions:

<u>First</u>: That the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of John Wallace; and

<u>Second</u>: That when the defendant, or one for whose conduct he is legally responsible, did so,

he intended to kill or do great bodily harm to John Wallace or another; or he knew that his acts would cause death to John Wallace or another;

or

he knew that his acts created a strong probability of death or great bodily harm to John Wallace or another;

or

he was committing the offense of Home Invasion or Aggravated Discharge of a firearm; and

<u>Third</u>: That the defendant, or one for whose conduct he is legally responsible, was armed with a firearm.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

(5) IPI 5.03A Accountability – Felony Murder stating:

"To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, John Wallace.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit Home Invasion or Aggravated Discharge of a Firearm, and that the deceased was killed by one of the parties committing that unlawful act."

¶ 65    Based on the evidence, defendant and Victor shared a common design promoted by defendant during which Victor intentionally killed John. See *id*. A week earlier defendant and Pete had gotten into an argument. In discussing their differences that same evening, Pete testified defendant threatened him to "watch out" referencing the potential involvement of their respective families and "guys." Pete told defendant not to come to his home. Nevertheless, defendant appeared on Pete's porch periodically throughout the day on September 1, 2013. When asked by Pete's brother to leave the porch, Pete said he heard defendant reply "I'll be back. I'm finna come back with 50 motherfuckers to shoot the block up." Another witness heard this reply to be "he will be back with 50 n***** to shoot the porch up." Marecko testified that defendant said "we do what the fuck we want to do" and "I'll be back."

¶ 66    Consistent with defendant's threats, sometime after 11:00 p.m. defendant did return and brought his two cousins, co-defendant's Victor and Charles. Victor and Charles both had guns. Victor immediately approached the porch looking for Pete stating "motherfuckers think I'm playing. Where is [Pete]?" and "you want to play with guns, you think it is funny, you think this is a joke?" As Victor approached the porch, defendant and Charles followed behind him. Victor beat on the entrance to Pete's home and unsuccessfully tried to enter. The victim, John, eventually opened the door and Victor again aggressively asked for Pete. John, upon seeing Victor's gun, shut the door on Victor. Victor immediately opened the door and started shooting.

¶ 67    Victor's intention to kill John is evident not only by his firing of bullets in John's direction after Victor opened the door but also by the multiple gun wounds John sustained resulting in his death. After the shooting defendant, Victor, and Charles were all observed running to Tamika's van to flee the scene. Marecko testified defendant stated "Well, motherfuckers wanna play with guns" before running toward the van. Katelynn testified defendant made a similar statement before the shooting.

¶ 68    We are not persuaded by defendant's argument that there can be no accountability because Victor became angry at John when he shut the door on him causing Victor to intentionally murder John. This is because "[o]nce an underlying common design to commit a planned offense is established, no *additional* common designs need be established for all of the individual acts committed during the commission of the planned offense *** [and] independent motives for these acts are not relevant, because a defendant should be accountable for these individual acts no matter what the principal's motive was in committing them. " (Emphasis in original.) *People v. McClain*, 269 Ill. App. 3d 500, 505 (1995), *overruled on other grounds by People v. Woods*, 193 Ill.2d 483, 489 (2000).

¶ 69     Based on the record before us the defendant would have been found guilty of intentional murder even if the jury was instructed on IFP and received a special verdict form for felony murder. Irrespective of the alleged erroneous instructions given for the felony murder charges we believe that because there is overwhelming evidence to support defendant's intentional murder conviction the IFP instructions would have no bearing on the outcome of this case. Because the outcome would be the same – defendant would be found guilty of intentional murder on a theory of accountability – we conclude the prejudice prong of the *Strickland* test has not been met. See *Veach*, 2017 IL 120649, ¶ 30.

¶ 70                    (b) No Separate Verdict Form for First Degree Murder

¶ 71     Defendant also argues his trial counsel was ineffective because a separate verdict form for first degree murder was not requested. Defendant argues that had counsel requested separate verdict forms he would have been able to "challenge a felony murder conviction on appeal and likely obtain reversal." That the jury would have (i) found defendant not guilty of intentional murder and strong probability murder or (ii) that he would be successful on appeal of a felony murder conviction is impermissible speculation by defendant particularly where, as we noted above, there is substantial evidence here to support his intentional murder conviction and defendant's arguments with respect to the felony murder charges have no bearing on his convictions for the other two versions of first degree murder. See *People v. Bew*, 228 Ill. 2d 122, 135-36 (2008) (noting "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). Moreover, we do not concede that a felony murder conviction based on the predicate of home invasion or aggravated discharge of a firearm is improper given the evidence at trial.

¶ 72    For the same reasons as set forth above, we find defendant has failed to satisfy the prejudice prong of the *Strickland* test.  See *Veach*, 2017 IL 120649, ¶ 30.  Again, this is because the evidence here supports defendant's intentional murder conviction and, as such, separate verdict forms would not have yielded a reasonable probability that the result of the proceeding here would be different.  See *id*.

¶ 73    We also note this court has previously found no ineffective assistance of counsel for failure to request separate first degree murder verdict forms.  See *People v. Moore*, 397 Ill. App. 3d 555, 567-68 (2009) (finding counsel not ineffective for failure to request independent first degree murder verdict forms because there would be no prejudice were evidence supported a guilty verdict on intentional murder and thus the result of the proceedings would be the same); see also *People v. Calhoun*, 404 Ill. App. 3d 362, 383-84 (2010) (finding failure to request independent first degree murder verdict forms did not satisfy *Strickland* test's presumption that counsel's actions constituted valid trial strategy where there was overwhelming evidence the defendant engaged in the predicate offense to the felony murder and thus it might be more difficult for the jury to find the defendant a murderer generally rather than a murderer based on the commission of the predicate offense);  see also *People v. Braboy*, 393 Ill. App. 3d 100, 108 (2009) (finding "defendant failed to overcome the presumption that counsel's decision not to request special [first degree murder] verdict forms was trial strategy" noting that Illinois "law did not and does not place a mandatory burden on counsel to request separate verdict forms."); see also *People v. Mabry*, 398 Ill. App. 3d 745, 755-56 (2010) (finding the same as *Braboy*).

¶ 74    Adding to the argument for valid trial strategy in this case, we further note that unlike the defendant's in *Braboy* and *Marby*, defendant here did not risk the jury returning a general guilty verdict yielding an increased sentence due to conviction for the independently charged predicate

to felony murder in addition to intentional murder because the State did not proceed on the underlying felonies of home invasion and aggravated discharge of a firearm. See *Braboy*, 393 Ill. App. 3d at 108; see also *Mabry*, 398 Ill. App. 3d at 755-56.

¶ 75                                                    Sentencing

¶ 76    Defendant's final argument challenges the constitutionality of his 50-year prison sentence. Specifically, defendant argues his 50-year sentence violates the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Defendant was sentenced to 35 years for first degree murder with a 15-year enhancement because Victor, for whom defendant was accountable, was armed with a firearm when he shot and killed the victim. Accordingly, defendant was sentenced to a total of 50 years in the Illinois Department of Corrections. Defendant argues the mandatory 15-year firearm enhancement, when added to the sentencing guidelines applicable to a first degree murder conviction of 20 to 60 years "imposed a *de facto* natural life sentence of 50 years in prison without consideration of the hallmarks of youth ***." For the reasons set forth below, this court will not address defendant's as-applied constitutional challenges to his sentence raised for the first time on appeal.

¶ 77                                              Proportionate Penalties

¶ 78    As noted in his brief, defendant's proportionate penalties challenge is an as-applied challenge. However, our supreme court's recent decision in *People v. Harris*, 2018 IL 121932, is directly on point and forecloses appeal in this proceeding because, as defendant acknowledges, it was not first raised in the trial court. *Id.* at ¶¶ 34-61. In *Harris*, the defendant who was 18 years old at the time of his offenses challenged the constitutionality of his sentence raising an as-applied challenge under the proportionate penalties clause of the Illinois Constitution as well as a

facial challenge pursuant to the eighth amendment of the United States Constitution. *Id*. With respect to his as-applied challenge, the defendant argued the statutory sentencing scheme as applied to him resulted in a mandatory *de facto* life sentence. *Id*. at ¶ 37. However, the court declined to address the defendant's as-applied challenges raised for the first time on direct appeal reasoning there was not a sufficiently developed record of the facts and circumstances relative to the defendant's claims and without such a record and finding that the statute is unconstitutional his as-applied challenges were premature. *Id*. at ¶¶ 38-40, 53.

¶ 79      Additionally, the court rejected the defendant's contention that the record was sufficiently developed to warrant review distinguishing the defendant's circumstances from the "very narrow exception" in *People v. Holman*, 2018 IL 121932. *Harris*, 2018 IL 121932, ¶¶ 43-45. On this point, the court highlighted the fact that Holman's challenge to his life without parole sentence pursuant to *Miller v. Alabama*, 132 S. Ct. 2455 (2016), (which prohibited mandatory life sentences for juveniles who commit murder) raised "purely legal issues" leaving only a determination of whether the trial court adequately considered the *Miller* factors at the original sentencing hearing which could be determined on the cold record. *Harris*, 2018 IL 121932, ¶¶ 43-45. This was the case solely because, like the defendant in *Miller*, Holman was a juvenile when he committed the offense at issue. *Id*. at ¶ 44. Distinguishing the defendant in *Harris* from Holeman, the court noted Harris was an adult at the time of his offenses such that *Miller* would not directly apply thereby requiring a sufficiently developed record in order to address his claim that *Miller* applied to his particular circumstances. *Id*. at ¶ 45. The court further declined to remand the constitutional claim for an evidentiary hearing in the trial court stating it believed the issue would be "more appropriately raised in another proceeding." *Id*. at ¶ 48.

¶ 80    Similarly, we find this court is without a sufficient record to address defendant's as-applied proportionate penalties claims raised for the first-time on direct appeal. *Id.* at ¶¶ 38-40, 53. Because defendant was an adult when he committed the offenses at issue here, we find the limited exception set forth in *Holman* does not apply to allow our review. *Id.* at ¶¶ 43-45. As in *Harris*, we note that our decision here does not foreclose any avenues in other proceedings that may be available to defendant to raise this issue. *Id.* at ¶¶ 34-48, 53.

¶ 81                                    Eighth Amendment

¶ 82    With respect to defendant's eighth amendment challenge, defendant claims this challenge is an as-applied challenge. While it is not entirely clear that defendant's argument is not a facial challenge, because defendant does not specifically seek a categorical ruling extending the eighth amendment protections recognized in *Miller* and similar cases to all 21 year-olds, we will address defendant's argument as an as-applied constitutional challenge. See *id.* at ¶ 53. Accordingly, here as with his challenge based on the proportionate penalties clause, defendant's claim fails "because no evidentiary hearing was held and no findings of fact were entered on how *Miller* [and other similar cases cited by defendant] applies to him as a [21-year old] young adult." See *id.* at ¶ 53. Without such a record and finding that the statute is unconstitutional, defendant's as-applied challenges are premature. See *id.* at ¶¶ 38-40, 53.

¶ 83    Again, our decision here does not foreclose any avenues in other proceedings that may be available to defendant to raise this issue. See *id.* at ¶¶ 34-48, 53.

¶ 84                                    CONCLUSION

¶ 85    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 86    Affirmed.