2024 IL App (1st) 220595-U

SECOND DIVISION
March 12, 2024

No. 1-22-0595

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 88 CR 13009 |
| | ) | |
| THEASTER HUNTER, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held*: Second-stage dismissal of postconviction petition affirmed. Recantation affidavit from State's witness insufficient to make substantial showing of actual innocence. Appointed counsel did not provide unreasonable assistance in proceedings below.

¶ 2     Petitioner Theaster Hunter was convicted of the first-degree murders of Ezekiel Rhoten and Sabrina Sommerville. He raises two issues on appeal from the second-stage dismissal of his postconviction petition. First, he argues that he has made a substantial showing of his innocence, based on a recantation affidavit from State's witness Doris Lamb, and he requests an evidentiary hearing on this claim. Second, and in the alternative, he requests a fresh round of second-stage proceedings, with new counsel, on the ground that his postconviction attorney failed to provide reasonable assistance in amending his *pro se* petition and submitting evidence in support of his

claims. We find that Lamb's affidavit is insufficient on its face, and that petitioner's contentions of unreasonable assistance of counsel are without merit. We affirm the dismissal of his petition.

¶ 3                                          BACKGROUND

¶ 4                              I. Overview of murders and trial

¶ 5      In November 1978, petitioner and four confederates invaded Rhoten's home, ransacked it for money and valuables, and brutally murdered Rhoten and his female companion Sommerville. The case went cold for years, until the new Automatic Fingerprint Identification System (AFIS) allowed the police to match Doris Lamb and Ella Haymon to fingerprints found at the scene.

¶ 6      Lamb and Haymon were arrested and separately interrogated in April 1987. They both admitted their participation and implicated three men—petitioner, Robert Tenney, and Johnny Armstrong—in these crimes. And they both identified petitioner as the one who hatched the plan to rob Rhoten and then murdered Rhoten and Sommerville in the course of executing that plan.

¶ 7      By then, Armstrong was dead. Tenney was tried and convicted separately. Lamb and Haymon testified against petitioner while their own charges were pending. Their testimony, as detailed below, was the only evidence implicating petitioner; his fingerprints were not found at the scene. (Neither were Tenney's or Armstrong's.) Their prior statements to the police, though largely consistent with their testimony, were introduced at trial to rebut an alleged motive to lie.

¶ 8      Petitioner did not testify. But he did present an alibi defense. His mother, Velma Hunter, and two sisters, Lillie Williams and Wanda Faye Garnder, all testified that petitioner was with them on the night of the murders. In sum, petitioner accompanied his sisters to the hospital to get care for Williams's ill children; returned to his mother's house, where she was hosting a party; went back to the hospital to pick up the others; and then spent the night at Williams's apartment. The alibi witnesses all remembered this particular evening, they claimed, because Williams's

mother-in-law was found dead in an alley the next morning.

¶ 9     For each murder victim, the jury was instructed on intentional, strong-probability, and felony murder. For the intentional and strong-probability charges, the jury was instructed on both principal liability and accountability. The State's lead argument was that petitioner personally killed Rhoten and Sommerville, but the State also argued that he was accountable for anything that his confederates did to further the common plan to rob Rhoten. The felony-murder charges were predicated on armed robbery, home invasion, and burglary.

¶ 10    The jury returned general verdicts of guilty on both murders. Petitioner was sentenced to natural life in prison. We affirmed his convictions on direct appeal, rejecting claims of a *Batson* violation and the improper use of Lamb's and Haymon's prior consistent statements. *People v. Hunter*, No. 1-91-0866 (June 26, 1996).

¶ 11                              II. Lamb's testimony

¶ 12    The State's case against petitioner comprised the testimony of Lamb and Haymon. Their accounts differed on a few finer points of detail, some of which we will note along the way. But on the essential points, their accounts were consistent. And petitioner's actual-innocence claim is based on Lamb's affidavit. So we will focus on her testimony.

¶ 13     The jury heard that the murder charges against Lamb were still pending when she took the stand. (So too for Haymon.) Lamb testified that the State agreed to "talk to [her] judge" and recommend leniency, but otherwise "promised [her] nothing" in exchange for her testimony against petitioner.

¶ 14    In November 1978, Lamb and Haymon were working as prostitutes and regularly using narcotics. Lamb had known petitioner for several years, as she "went with" his brother Evanew and, for a time, lived with Evanew in their mother's house (where petitioner supposedly was on

the night of the murders). Rhoten was one of Haymon's "johns." Haymon had been staying at Rhoten's house but recently moved out.

¶ 15    On the evening of the murders, Lamb and Haymon went to a neighborhood pool hall, where they ran into petitioner, Tenney, and Armstrong. Petitioner told Lamb to go outside, pointed a gun at her, and admonished her to stop using drugs, as if he was "playing a big brother role." (Petitioner had been out of prison, after serving his sentence on a previous armed robbery, for a matter of weeks.) The five confederates got into Tenney's car and drove to Rhoten's house. At the time, Lamb thought they were going to pick up Haymon's belongings.

¶ 16    On the way there, petitioner asked Haymon if Rhoten had any money. When Haymon said yes, petitioner announced "that he was going to stick him up." Here was petitioner's plan: Lamb and Haymon would go inside, on the pretense of collecting Haymon's things, and leave the front door open, so that petitioner, Tenney, and Armstrong could come in a few minutes later.

¶ 17    When they arrived, Lamb and Haymon approached the house next to Rhoten's, spoke to a neighbor, and claimed, upon returning to the car, that Rhoten wasn't home. Petitioner didn't buy it, and he promptly told Haymon "what he was going to do to her" if she "didn't get it right." In her own testimony, Haymon said explicitly that petitioner threatened to kill her.

¶ 18    As expected, Rhoten let the women inside. Sommerville was with him in the front room of the house. Within minutes, as planned, petitioner came in through the front door, armed with a pistol, and with Tenney and Armstrong in tow. Petitioner pointed his gun at Rhoten's head and declared that "it was a stick-up." Rhoten reached for a gun under a chair, but petitioner hit him in the head with his pistol, picked up Rhoten's gun, and gave it to Armstrong. Sommerville tried to help Rhoten, but Armstrong hit her on the head with a vase. She fell onto the couch and appeared to lose consciousness.

¶ 19   Tenney stayed downstairs to watch over Sommerville. The others took Rhoten upstairs to his bedroom, where petitioner ordered him to lie down on his bed. Petitioner demanded money, and when Rhoten said he didn't have any in the house, petitioner starting hitting him in the head. Haymon, Lamb, and Armstrong ransacked the bedroom at petitioner's behest but didn't find any money. Petitioner escalated the violence. He first ordered Haymon to beat Rhoten with a belt. Her efforts proved too timid for petitioner's taste, so he ordered Lamb to take over, which she did. Petitioner then tied Rhoten to the bed and again demanded money, and again to no avail. So petitioner ruthlessly butchered Rhoten with a large knife, cutting his neck and body more than 30 times, and stabbing him six times in the chest and four times in the back.

¶ 20   Rhoten cried out that petitioner couldn't kill him, or something to that effect, to which petitioner responded, "Motherfucker, you will die." Petitioner put a pillow over Rhoten's face and shot him once in the head. Suffice it to say that Rhoten's wounds, as described in gruesome detail by the medical examiner, were fatal.

¶ 21   Petitioner went back downstairs and bashed Sommerville's skull. Lamb said he used his gun; Haymon said he used a hammer. Either way, Sommerville died of cranial cerebral injuries caused by blunt trauma. Petitioner covered her body with a sheet and continued his search for money and valuables. The confederates left the house with jewelry, electronics, clothing, and other items, some of which may have been Haymon's. On the way back to petitioner's house, where they all spent the night, petitioner wrapped the knife and Rhoten's keys (and possibly a hammer) in a sheet before tossing them out of the car.

¶ 22                            III. Initial postconviction petition

¶ 23   Petitioner filed his initial *pro se* postconviction petition in 1995. The only claims relevant to this appeal are his allegations of ineffective assistance of counsel. Petitioner alleged that trial

counsel was ineffective on eight grounds, one of which was a failure to interview additional alibi witnesses. Petitioner did not attach affidavits from these alibi witnesses to his initial petition. He further alleged that direct-appeal counsel was ineffective for "fail[ing] to raise the specific issues indicated above." We will have more to say about the details of these allegations later.

¶ 24    Assistant Public Defender (APD) Gwyndollette Ward-Brown was appointed to represent petitioner. The State moved to dismiss the petition as untimely. Counsel did not file a response, and the circuit court granted the State's motion. On appeal, we accepted the State's confession of error. In finding the petition untimely, the circuit court applied the wrong statute. We remanded for second-stage proceedings. *People v. Hunter*, No. 1-98-4801 (May 19, 2000).

¶ 25                                    IV. Proceedings after the 2000 remand

¶ 26    Following the 2000 remand, Ward-Brown was reappointed. She soon indicated at a status hearing that she was "seeking to file a second PC." But she never did. More importantly, the case slipped through the cracks. To make a long story short, the circuit court never conducted second-stage proceedings on the initial petition—at least not until we ordered them *again* in 2013. *People v. Hunter*, 2013 IL App (1st) 113194-U.

¶ 27    In the 13 years that it took to acknowledge and remedy this oversight, an understandably frustrated petitioner filed an avalanche of *pro se* pleadings, variously styled as postconviction petitions, amendments to his initial petition, *habeas corpus* petitions, and motions of all sorts. Over the years, he raised more than 100 claims of error, repeatedly moved to have the public defender's office removed from his case, and made numerous futile attempts to have his petition "advanced," "redocketed," or to otherwise have his claims, including those raised in his initial petition, finally heard on the merits.

¶ 28    It will serve no relevant purpose to dwell at length on the convoluted and regrettable

history of these proceedings. Interested readers are referred to the thorough exposition in our 2013 decision. See *id.* ¶¶ 37-78. To understand the limited issues before us, three points suffice.

¶ 29    First, the vast majority of claims raised in the subsequent pleadings were dismissed on grounds of *res judicata*, waiver, and other such procedural bars. What's more, the pleadings were generally treated as successive petitions, subject to the cause-and-prejudice standard. But we held that all of these procedural rulings—many of which had been affirmed on appeal—were wrong, or at least premature, because the initial petition was never adjudicated on the merits. See *id.* ¶¶ 120-125. Thus, in amending the petition on a second remand, counsel was free to adopt any claims raised in the additional *pro se* pleadings that were dismissed on these spurious procedural grounds, provided of course that the claims, in counsel's judgment, had at least arguable merit.

¶ 30    Second, in various *pro se* pleadings, petitioner attached the alibi affidavits that he failed to include in his initial petition, in support of his *Strickland* allegation against trial counsel. All in all, there were affidavits from 12 alibi witnesses, all dating from 1999-2000, and all identical in substance. (It was a form affidavit with blanks for the name and signature of each affiant.) The affidavits stated, in sum, that on the night of the murders, defendant was at his mother's house, where she was hosting a card game. He stayed there the entire evening, except for a trip to the hospital. At no point did Lamb or Haymon come to the house.

¶ 31    Third, petitioner alleged a claim of actual innocence, based on an affidavit from Lamb. Lamb's affidavit was of the same vintage as the alibi affidavits, late 1999, though oddly it bears two different notary stamps (from November 11 and December 16 of that year). The affidavit was initially attached to a petition filed in 2000, in support of an allegation that Lamb testified falsely. Petitioner later amended his claim, alleging his actual innocence, in a 2010 filing.

¶ 32     Lamb attests that after she was arrested, she was "forced to give false statements and testify falsely at trial due to the fact that I was coerced and afraid for my life because I was on drugs, cocaine, heroin, tees and blues." She goes on to say that she "was coerced into implicating Theaster Hunter in the murders of Ezekiel Rhoten and Sabrina Sommerville in return for my life, a lesser sentence. To my knowledge, Theaster Hunter did not kill Ezekiel Rhoten and Sabrina Sommerville."

¶ 33                    V. Belated second-stage proceedings

¶ 34     After the 2013 remand, Ward-Brown was again reassigned to the case. Petitioner insisted from the very beginning (and is keen to reiterate on appeal) that he wanted "all" of his claims raised. And so he did. But counsel was not obliged to raise—and, we would add, was ethically obliged *not* to raise—claims that lacked arguable merit. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). And recall that over the years, petitioner raised more than 100 claims. So to put it mildly, there were voluminous pleadings for Ward-Brown to review. These proceedings, in part by petitioner's own doing, would thus continue to be a slog for some time.

¶ 35     That said, Ward-Brown represented to the court that she did intend to file an amended petition in due course, however long that might take. For one, she was doing yeoman's work. As she explained, she sought to compile all of petitioner's (non-frivolous) claims into a single pleading, so that the circuit court could rule on them in one fell swoop and thus bring the proceedings to an expeditious, and long-overdue, resolution.

¶ 36     And beyond that, Ward-Brown also needed to complete her ongoing investigation, which had two focal points. First, she was trying to locate and interview the various affiants. Second, Lamb supposedly made a videotaped statement in which she recanted her testimony, as she did in her affidavit, but ostensibly in more detail. Petitioner's family was said to have access to the

video and was supposed to bring it to court, but so far it had not turned up. Naturally, Ward-Brown was waiting to hear what else Lamb might have to say.

¶ 37     After months of investigating in this vein, Ward-Brown filed a Rule 651(c) certificate and stood on the initial *pro se* petition, without amendment. There is no dispute that the certificate facially complied with the rule.

¶ 38     Petitioner strenuously objected and asked (as he had done many times before) to have Ward-Brown, and the entire public defender's office, removed from his case. He also asked to proceed *pro se*, a request that was initially denied. In response to these motions, Ward-Brown noted that she "investigate[d] for several months," contacted witnesses, and ultimately concluded that she would not amend the petition after all. As she summed it up, "I'm not going against his petition as he's written it, but I am not amending his petition. He's correct on that."

¶ 39     These remarks reflect a perhaps not uncommon predicament of appointed postconviction counsel: counsel finds, for whatever reason, that one or more *pro se* claims must be abandoned at the second stage; but counsel is guarded and reticent about the reasons for this determination, so as not to argue against her own client in court. As we read Ward-Brown's remarks on the record here, she was trying to walk this fine line.

¶ 40     But there is more to this particular record than the proceedings in open court. Petitioner filed a complaint against Ward-Brown with the ARDC. (It was not his first.) And in one of his many motions to appoint a bar-association attorney, in lieu of the public defender's office, he attached a letter that Ward-Brown sent to the ARDC in response to his complaint. The letter is dated about a month after the Rule 651(c) certificate was filed and directly addresses the basis for this determination. To this end, Ward-Brown reported the results of her efforts to contact the alibi witnesses and locate Lamb's videotaped statement.

¶ 41　As for the affidavits, Ward-Brown "spoke to family about their signatures on affidavits that were attached to [petitioner's] pro se filings and they denied any knowledge." Ward-Brown went on to explain that petitioner "had affidavits from family members that were infants *** when the crime occurred." Ward-Brown "still spoke to them and asked them if they signed them and of course they had not."

¶ 42　As for the Lamb video, petitioner said "that his daughter had [it]," but when Ward-Brown spoke to her, "[s]he did not know what [counsel] was talking about." Ward-Brown also contacted the Center For Wrongful Convictions at Northwestern University Law School, where the video had allegedly been sent at some point, but "they did not have any such tape."

¶ 43　It was for these reasons that Ward-Brown wrapped up her investigation and filed a Rule 651(c) certificate. She would, if called upon, "argue all of Mr. Hunter's contentions as if they are true even though in my review I have not found that to be the case." But given the results of her investigation, she could not amend the petition.

¶ 44　The Rule 651(c) certificate ushered in yet another round of vociferous complaints from petitioner about Ward-Brown. We will spare the reader the details. Of note, though, was a brief hearing at which Ward-Brown appeared pursuant to a subpoena. The topic at hand was the elusive Lamb video, which petitioner wanted, along with all the discovery in the case, so that he could amend his petition himself and proceed *pro se*.

¶ 45　Petitioner claimed that a copy of the video was given to the public defender's office, and then made its way to the appellate court and back to the public defender. Another copy was sent to Northwestern. Ward-Brown stated on the record that she did not have any such tape, and that she contacted Northwestern in search of the tape, but "they did not give me a tape." The State, which had access to the same record as the public defender and the appellate court, denied any

knowledge of the alleged tape. The circuit court was "satisfied that the Public Defender's office does not have any recantation tapes."

¶ 46    To make yet another long and convoluted story short, the circuit court denied petitioner's repeated motions to appoint a bar-association attorney, but eventually granted his motion to proceed *pro se*. Petitioner filed an amended petition; the State moved to dismiss it; petitioner filed a response, largely reiterating the claims in his petition; and the court set the motion to dismiss for argument. All the while, petitioner continued to object that he did not receive all the discovery materials that he thought he was entitled to after electing to represent himself. But we will say no more about that protracted discovery dispute—or the rest of the miscellaneous *pro se* filings that inundated the circuit court during this (and every other) phase of the proceedings.

¶ 47    The amended petition, in sum, included all the ineffectiveness allegations from the initial petition, along with additional ineffectiveness allegations against appellate counsel; the actual-innocence claim, based on Lamb's affidavit; and many other claims that are not at issue. Petitioner included the purported alibi affidavits.

¶ 48    The State's motion to dismiss was short on substance. It emphasized that petitioner failed to include the alleged videotape of Lamb's recantation, document its whereabouts, or provide a transcript of its contents. Remarkably, the motion said nothing at all about the (in)sufficiency of Lamb's *affidavit* as evidentiary support for petitioner's actual-innocence claim.

¶ 49    The State asserted that the alibi affiants were known at the time of trial, and that their affidavits were cumulative of the alibi witnesses and "not dispositive of total vindication." As for the underlying *Strickland* claim, the State asserted that petitioner was objecting to trial strategy. The remaining *Strickland* allegations were conclusory, unsupported, or "fail[ed] to contravene the appellate record." But particulars aside, the important point for our purposes here is that the

State argued, or at least asserted, that the claims all failed on the merits.

¶ 50   Oral argument on the motion to dismiss was equally short on substance. It kicked off with petitioner (once again) accusing the State of lying to the court about discovery matters. The State recited its cursory motion, with no elaboration of any kind. Before petitioner could say a word in response to the State's points, the court, no doubt tired of his antics, cut him off and announced its ruling: "I agree with the State 100 percent." And that was that.

¶ 51   Petitioner's motion to reconsider was denied. We accepted his late notice of appeal. So here we are, reviewing an adjudication on the merits, some 24 years after we first remanded this case for second-stage proceedings.

¶ 52                                              ANALYSIS

¶ 53                                       I. Actual innocence

¶ 54   Petitioner argues that he has made a substantial showing of his innocence, based on Lamb's affidavit. He argues that the circuit court thus erred in dismissing his actual-innocence claim at the second stage, and he requests a remand for an evidentiary hearing.

¶ 55   A second-stage motion to dismiss tests the legal sufficiency of the allegations. *People v. Sanders*, 2016 IL 118123, ¶ 31. "All well-pleaded factual allegations not positively rebutted by the record" must be liberally construed in the petitioner's favor and taken as true. *Id.* ¶¶ 31, 42. The court may not engage in fact-finding, make credibility judgments, or invoke the principle that recantations are "inherently unreliable" at this stage. *Id.* ¶¶ 31, 33, 42.

¶ 56   A postconviction claim may be dismissed without an evidentiary hearing only if it fails to make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). We review the circuit court's ruling *de novo*, making "our own independent assessment of the allegations of the petition and supporting documentation." *Sanders*, 2016 IL 118123, ¶ 31.

And we may affirm the dismissal of a postconviction petition on any basis supported by the record. *People v. Jones*, 2021 IL App (1st) 182392, ¶ 39. We will avail ourselves of this rule here.

¶ 57    To establish a claim of actual innocence, the supporting evidence must be: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47.

¶ 58    The Lamb affidavit reads as follows:

> "On April 22, 1987, I, Dolores Lamb, was arrested and charged with two counts of murder and home invasion, and that I was forced to give false statements and testify falsely at trial due to the fact that I was coerced and afraid for my life because I was on drugs, cocaine, heroin, tees and blues.
>
> I, Dolores Lamb, was coerced into implicating Theaster Hunter in the murders of Ezekiel Rhoten and Sabrina Sommerville in return for my life, a lesser sentence. To my knowledge, Theaster Hunter did not kill Ezekiel Rhoten and Sabrina Sommerville."

¶ 59    As we can affirm on any basis in the record, we focus here on the prong of conclusiveness. The question for conclusiveness is whether, taking the affidavit as true, "it is more likely than not that no reasonable juror would have convicted petitioner." *Id.* ¶ 61.

¶ 60    Lamb's affidavit claims "coercion" in that she feared a life sentence; she says she was forced to give false testimony in exchange for a lesser sentence. And she states that, "[t]o [her] knowledge," petitioner did not commit the two murders in that house.

¶ 61    Taken literally, and in its ordinary usage, the phrase "to my knowledge" is equivalent to the phrase, "as far as I know." Thus, on a literal interpretation, Lamb claims that although she testified that petitioner committed the murders, she did not, in fact, know that to be true. In this

sense, her testimony may have been "false," as she said, but this does not make for a conclusive affidavit. It effectively erases Lamb's testimony, but it offers nothing in its place; it thus leaves Haymon's testimony intact, since there is no new evidence to contradict it. If this is what Lamb's affidavit means, petitioner's claim fails.

¶ 62    But we must liberally construe the affidavit in petitioner's favor on a motion to dismiss. *Sanders*, 2016 IL 118123, ¶ 31. And there is, in fairness, a more charitable interpretation of these words. After all, Lamb testified that she was in the room and witnessed the murders of Rhoten and Sommerville with her own eyes. She does not claim otherwise in her affidavit. So Lamb would *know* whether petitioner committed the murders. Claiming that petitioner did not commit the murders "to her knowledge" is an awfully odd and qualified way for Lamb to convey a fact that she (allegedly) knows to be true; still, we should be careful not to require too much by way of wordsmithing and eloquence from an affiant who might be less educated and without assistance of counsel. So we will assume, lending all favorable inferences to petitioner, that Lamb testified here that petitioner did not kill either Rhoten and Sommerville.

¶ 63    Unfortunately for petitioner, that assumption still does not get him the outcome he seeks. No doubt, this affidavit, accepted as true for now and as we have liberally construed it, would exonerate petitioner under a theory of *principal* liability for the deaths of these individuals. On a theory of principal liability, petitioner personally killed Rhoten (by stabbing and shooting him) and Sommerville (by bashing her skull). Lamb's affidavit says, albeit without any further detail, that petitioner "did not kill" either of them. No rational juror, taking this statement as true, could convict petitioner on a theory of principal liability.

¶ 64    It is irrelevant that Haymon's trial testimony, as the State says, "corroborated" Lamb's testimony. That is just another way of saying that Haymon's testimony contradicts Lamb's new

recantation affidavit. So it does. But that contradiction does not make Lamb's affidavit less than conclusive at the second stage, for the reasons our supreme court explained in *Robinson*, 2020 IL 123849, ¶ 57. Nearly four years after *Robinson* rejected this "fundamentally illogical" argument (*id.*), the State is still advancing it. It is long past time to stop.

¶ 65    In short, Lamb's affidavit would warrant an evidentiary hearing—*if* principal liability were the only theory of guilt put before the jury. But it was not. The jury was also instructed on accountability for both murders, as well as felony-murder charges predicated on armed robbery, home invasion, and burglary.

¶ 66    In addition to killing Rhoten and Sommerville, Lamb (and Haymon) testified that it was petitioner's plan to rob Rhoten in the first place. He announced that plan in the car: after asking Haymon whether Rhoten had any money, and being told that he did, petitioner said "that he was going to stick [Rhoten] up." Petitioner conceived of the plan to use the women to gain entry to Rhoten's house. He conscripted the women, or at least Haymon, into the scheme by threatening to kill her if she failed to cooperate. He led the charge into the house once the women gained entry and announced that "it was a stick-up." He subdued Rhoten, when he lunged for his gun, by hitting him in the head, and later by ordering him around under threat of violence. He demanded money and directed the activities of his confederates, or at least the women—who no doubt remembered the threat he had just issued in the car. He helped ransack the house for valuables and carry Rhoten's belongings out of it.

¶ 67    Petitioner's participation in the scheme to rob Rhoten, from start to finish, was more than enough to convict him of the murders on either a theory of accountability or of felony murder— even if he did not personally kill either of the victims during the course of the home invasion and robbery. As detailed by Lamb (and Haymon), the murders were committed "in furtherance of [a]

common design" to rob Rhoten, and petitioner "aid[ed] in the planning and commission" of that offense, as necessary for accountability. 720 ILCS 5/5-2(c) (West 1976). For much the same reasons, he participated in the commission of a "forcible felony" (more than one, in fact), and it was "in the course of or in furtherance of" their underlying crime that a "participant cause[d] the death of" the victims, as necessary for felony murder. 720 ILCS 5/9-1(a)(3) (West 1976).

¶ 68     Lamb's statement that petitioner "did not kill" Rhoten or Sommerville is not conclusive on a theory of accountability or felony murder. See *People v. Edwards*, 2012 IL 111711, ¶¶ 39-41 (affidavit stating petitioner "had nothing to do with this shooting" was not conclusive, for purposes of actual-innocence claim, where petitioner was convicted on accountability theory). Lamb does not deny that petitioner was one of the confederates who entered Rhoten's home to rob him. She does not deny that petitioner conceived of the scheme and enlisted the others to help carry it out. Nothing she says calls into question that the murders were committed in the course of, and indeed in furtherance of, the plan to rob Rhoten.

¶ 69     Lamb does not recant *anything but* her testimony that it was petitioner who committed the *actus reus* of the murders. Her affidavit thus fails to establish that "it is more likely than not that no reasonable juror would have convicted petitioner" on the theories of accountability and felony murder on which the jury was instructed. *Robinson*, 2020 IL 123849, ¶ 61.

¶ 70     We recognize that the jury returned general verdicts of guilty on the murders, without specific findings of accountability or felony murder. But "[i]t is 'well settled' that, when an indictment alleges multiple forms of a single murder, and a general verdict is returned finding defendant guilty of first degree murder, 'the net effect is that the defendant is guilty as charged in each count.' " *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 173 (quoting *People v. Davis*, 233 Ill. 2d 244, 263 (2009)). These alternative grounds for liability were before the jury, the evidence

was more than sufficient to support both of them, and Lamb's affidavit does not move the needle at all on either one. So even liberally construed, Lamb's affidavit falls short of conclusive evidence of petitioner's innocence. We affirm the dismissal of his actual-innocence claim on this basis.

¶ 71                                    II. Reasonable assistance of counsel

¶ 72    Since we have denied petitioner's request for an evidentiary hearing, we must consider his alternative request to remand the case for another round of second-stage proceedings. In the last round, he argues, Ward-Brown failed to provide the reasonable assistance of counsel to which he is entitled. 725 ILCS 5/122-4 (West 2022); *People v. Perkins*, 229 Ill. 2d 34, 42 (2007).

¶ 73    A facially valid Rule 651(c) certificate creates a presumption of reasonable assistance, but that presumption is rebutted if the record shows that counsel failed to comply with one or more of the specific duties imposed by the rule. *Perkins*, 229 Ill. 2d at 52. Petitioner argues that Ward-Brown failed in three such respects. We review these contentions *de novo*. *Id.* at 41.

¶ 74    First, petitioner argues that Ward-Brown failed to shape his *pro se* allegations into proper legal form. In particular, the *pro se* petition alleged several claims of ineffective assistance of trial counsel. Because, he says, these claims were "based entirely on the record from trial," they could—and should—have been raised on direct appeal. To avoid procedural default, it was therefore necessary to allege that direct-appeal counsel was ineffective for failing to raise them. Ward-Brown was thus obliged to add these necessary allegations. But she failed to do so.

¶ 75    Postconviction counsel does indeed have a duty to amend *pro se* claims as necessary to avoid procedural default; such amendments are a routine part of shaping the claims into their "proper legal form." *Id.* at 44; *People v. Kluppelberg*, 327 Ill. App. 3d 939, 947 (2002). But this rule does not help petitioner for two reasons. For one, he did allege, in his *pro se* petition, that

direct-appeal counsel was ineffective for failing to assert his claims of ineffective assistance of trial counsel. And nearly all of these claims required evidence outside the trial record, so they could not be raised on direct appeal in the first place.

¶ 76   The *pro se* petition alleged that "appellate counsel *** failed to raise the specific issues indicated above." (For the sake of clarity and specificity, we will use the phrase "direct-appeal counsel" to refer to the attorneys who handled petitioner's direct appeal. We will use the phrase "appellate counsel" to refer to all attorneys currently representing petitioner in *this* appeal.) Read in context, this clearly refers to petitioner's claims of ineffective assistance of trial counsel.

¶ 77    But this allegation, we are told, is insufficient and thus required amendment. A bit of procedural history will put this argument in context. Apart from using the usual, generic term "appellate counsel," the petition also referred by name to one Dennis Foley, a private attorney who was appointed to represent petitioner on direct appeal, after the public defender was given leave to withdraw. Foley also withdrew before filing a brief. (We will again spare the reader the details.) Petitioner's direct appeal was dismissed for want of prosecution. It was reinstated—but only after he filed the initial *pro se* petition. The Office of the State Appellate Defender was then appointed and filed a brief in petitioner's direct appeal.

¶ 78   So the argument, as we understand it, is this: The *pro se* allegation is limited to Foley's ineffectiveness and does not apply to the assistant appellate defender who *actually briefed* the direct appeal. The *pro se* allegation went on to mention Foley by name, and it complained that Foley not only failed to raise *certain* issues, but in the end failed to raise *any* issues at all. By virtue of this additional detail and specificity, the facially generic allegation that "appellate counsel *** failed to raise the specific issues indicated above" did not survive the change in personnel from one particular appellate attorney to the next.

¶ 79    We reject this argument, and emphatically so. Unlike an ARDC complaint, or a suit for malpractice, an ineffective-assistance claim is not a complaint about a particular attorney. It does not seek a remedy from, or a sanction against, any particular attorney, and so the identity of a defendant's attorney generally does not matter. The question is simply whether the defendant received the competent representation that the sixth amendment guarantees at critical stages of a criminal case. And if he did not, he is entitled to a new proceeding.

¶ 80    For purposes of an ineffective-assistance claim, the allegedly defective representation could have been provided by this attorney or that attorney, by one attorney, by multiple attorneys working as a trial or appellate team, or, as here, by multiple attorneys handling the relevant stage of the proceedings in succession. These are all perfectly routine scenarios in our experience. And whatever the case may be, generic allegations about the ineffectiveness of "trial counsel" are routinely deemed sufficient and taken to refer collectively to whatever attorney(s) happened to fill that role. So too for "appellate counsel."

¶ 81    Petitioner's allegation that "appellate counsel *** failed to raise the specific issues indicated above" clearly alleges that his claims of ineffective assistance of trial counsel should have been, but were not, raised in his direct appeal, and that the appellate representation he received was, for this reason, not competent by sixth-amendment standards. That allegation is sufficient; the additional references and detail pertaining to one specific attorney—attorney Foley—are just surplusage. Of course the *pro se* allegations could have been cleaned up. But the question is whether they suffered from a deficiency in legal form that required a routine amendment by counsel to avoid a procedural default. They did not.

¶ 82    If the State were to argue that a claim of ineffective assistance were defaulted or otherwise inadequate on this basis, we would not hesitate to reject the argument as frivolous. If a

claim were dismissed on this basis, we would not hesitate to reverse. There has been no such argument, and no such ruling, in this case; at no time have petitioner's *Strickland* claims been rejected on this basis. Rather, it is petitioner who advances a novel and frivolous forfeiture argument, and then stands it on its head in the hope of securing another remand and keeping these proceedings alive.

¶ 83    That is reason enough to reject petitioner's argument. But for the sake of completeness, we note that most of his claims of ineffective assistance of trial counsel—six out of eight—were not based entirely on the trial record in the first place. They are as follows: trial counsel (1) was conflicted, on account of simultaneously representing Lamb and Haymon; (2) failed to interview additional alibi witnesses; (3-4) failed to obtain, and obstructed petitioner's access to, "personal notes" taken by police officers; (5) failed to advise petitioner that neither the defense nor the State would call alibi witnesses; and (6) failed to conduct a complete investigation into a "plausible lead."

¶ 84    A moment's reflection shows that all of these allegations require an evidentiary basis that is, at least in part, outside the trial record: an affidavit from an alibi witness, for example; or one from defendant himself, attesting to counsel's failure to advise him of this or that, or explaining what counsel did to obstruct the discovery process; or whatever the case may be. Nor is it surprising that the record does not disclose the name(s) of Lamb's attorney(s). (Haymon happened to testify that her attorney was Neil Spector. Petitioner's trial attorneys were Judith Stewart and Patrick Moriarty. To this extent, the trial record thus *refutes* petitioner's claim.)

¶ 85    A *Strickland* claim that is based on matters outside the trial record must be raised on collateral review. *People v. Veach*, 2017 IL 120649, ¶¶ 46-48; see *People v. Erikson*, 161 Ill. 2d 82, 88 (1994) (claims based on what counsel *should* have done, but failed to do, typically depend

on matters outside trial record). Thus, an allegation that direct-appeal counsel was ineffective for failing to raise these particular *Strickland* claims—an allegation that the *pro se* petition already included—was neither necessary to avoid procedural default nor even correct.

¶ 86    Petitioner pulls other *pro se* claims out of the mix and asserts, baldly and incorrectly, that they were likewise based entirely on the trial record—for example, the State's alleged *Brady* violation. The same points apply to these claims, too, but we will not belabor them any further.

¶ 87    Of the remaining two claims of ineffective assistance of trial counsel, one alleged that counsel "lacked acuity" in formulating questions on cross-examination. To the extent that this claim is any better than frivolous, and we are not sure that it is, it should have been raised on direct appeal. But petitioner alleged as much in his postconviction petition. And his final claim is nonsense: trial counsel should have "preserve[d]" his claims of ineffective assistance of trial counsel in a motion for new trial. For obvious reasons, there is no such requirement. So there was nothing for direct-appeal counsel to raise here, and thus no allegation that Ward-Brown needed to add to the *pro se* petition. And again, the *pro se* petition actually included this (unnecessary and legally incorrect) allegation to begin with. There was no need, and thus no duty, to amend the *pro se* allegations to avoid procedural default of any otherwise arguable claim.

¶ 88    Second, petitioner argues that Ward-Brown unreasonably failed to attach the affidavits of his additional alibi witnesses to his petition. Because he included the alibi affidavits with several earlier *pro se* pleadings, they were readily available to Ward-Brown. Submitting them on his behalf, this time around, was thus a trivial ministerial task that she had no good reason to forego.

¶ 89    Petitioner's argument ignores Ward-Brown's letter to the ARDC (which petitioner himself made part of the record), written in response to one of his many complaints, in which she

disclosed that the alibi "affidavits" turned out to be fraudulent, and thus not really affidavits at all. The purported affiants who met with Ward-Brown disclaimed any knowledge of these "affidavits," denied signing them, and could not possibly serve as alibi witnesses because they were "infants" in November 1978.

¶ 90    Ward-Brown correctly concluded that she could not submit these documents as if they were competent evidence. She would have committed a serious ethical violation by doing so. We should not have to make this point in print, in response to an argument by appellate counsel. And we will give no quarter to any interpretation of Rule 651(c) that not only permits but *requires* an attorney to submit evidence, in a sworn pleading, that the attorney has discovered to be a fraud or fabrication—including, but not limited to, "affidavits" that the named "affiants" have expressly disavowed as outright forgeries.

¶ 91    In considering Ward-Brown's representations to the ARDC, we are not running afoul of the principle that the allegations and supporting affidavits are taken as true for the purposes of a second-stage motion to dismiss. (Ward-Brown herself was well aware of this principle; she cited it in her letter.) The issue before us is not whether the underlying *Strickland* claim should have survived the motion to dismiss and advanced to a hearing. The issue is whether Ward-Brown fell short of Rule 651(c) compliance when she "failed"—or better, declined—to submit the purported alibi affidavits on petitioner's behalf.

¶ 92    For this purpose, we may consider Ward-Brown's representations to the ARDC, for the light that they shed on her decision not to submit these documents to the court. Ward-Brown's letter is in the record, having been placed there by petitioner himself, as an exhibit to one of his motions. And we have no reason to believe that her representations were anything but a truthful and reliable statement of the results of her investigation. We note that these representations were

made by an attorney "in connection with a disciplinary matter," so Ward-Brown would have been subject to significant disciplinary sanctions if she "knowingly ma[d]e a false statement of material fact." Ill. R. Prof. Cond. 8.1(a) (eff. Jan 1, 2010).

¶ 93    We have said more than enough to dispose of petitioner's claim. But we will add this, for good measure: when all was said and done, the alibi "affidavits" were submitted to the circuit court in support of the relevant *Strickland* claim. Petitioner attached them to his amended *pro se* petition, the pleading that was ultimately the subject of the State's motion to dismiss and the circuit court's second-stage ruling. The State never argued that the claim failed because it lacked supporting affidavits; it argued, among other things, that the testimony of the purported affiants would have been cumulative and insufficient to show prejudice. The circuit court said it agreed with the State's assessment. Petitioner does not challenge that ruling on appeal or contend that this claim merits an evidentiary hearing.

¶ 94    In short, petitioner's evidence didn't fall by the wayside. Even if we ignore everything that the affiants told Ward-Brown, for argument's sake, a remand would accomplish nothing, since there is nothing here to be remedied. New counsel would simply resubmit affidavits that were already before the circuit court when it ruled on petitioner's claim. We will not mandate this pointless exercise.

¶ 95    Third, petitioner argues that Ward-Brown unreasonably failed to amend the initial *pro se* petition to include his claim of actual innocence. Other "potentially meritorious" claims, too, he says, but he makes no effort at all to identify them, much less explain why they were potentially meritorious. (Recall that counsel has no duty to assert frivolous claims in an amended petition. *Greer*, 212 Ill. 2d at 205.) So we can leave this bald assertion aside and focus on petitioner's claim of actual innocence.

¶ 96    True, Ward-Brown did not adopt this claim. And we don't know why. (Her remarks seem to suggest that it was her inability to confirm the existence of Lamb's alleged recantation video.) But it ultimately doesn't matter. In contrast to *People v. Addison*, 2023 IL 127119, ¶¶ 7, 24, 40, for example, the amendments that counsel made, or failed to make, did not result in a claim being dismissed, at least in part, because of a procedural default. Here, petitioner's innocence claim was adjudicated on the merits, and has now made its way to the appellate court for *de novo* review—all without so much as an allegation of default or forfeiture from the State, much less a ruling on these grounds from the circuit court.

¶ 97    And we have found that the claim fails on the merits, not because of a defective legal form that counsel could have fixed by amendment (see *Perkins*, 229 Ill. 2d at 43-44), but rather because petitioner's evidentiary support for this claim—Lamb's affidavit—is insufficient. That is not counsel's fault. Nor is it a basis for mandating a pointless second-stage mulligan so that new counsel can simply present, once again, a claim whose dismissal on the merits has already been affirmed on appeal. Put differently, there is nothing here to remedy in another round of second-stage proceedings—except a failure that is chargeable to petitioner himself.

¶ 98    Lastly, petitioner claims that his waiver of counsel in the second-stage proceedings was not valid, because Ward-Brown's unreasonable assistance left him with no meaningful choice but to waive his statutory right to counsel and go it alone. This argument is intended to forestall an objection that petitioner waived his claims of unreasonable assistance by electing to proceed *pro se*. Given the procedural snafus that have plagued this case, we have found it prudent to give full consideration to all of petitioner's complaints about the proceedings and about the representation he received after our last remand, without considering this potential objection. So we need not consider his waiver argument any further.

¶ 99                              CONCLUSION

¶ 100   The judgment of the circuit court is affirmed.

¶ 101   Affirmed.